**FEDERAL DEPOSIT INSURANCE CORPORATION, a United States corporation, Plaintiff–Appellant,**

v.

**BANK OF BOULDER, a Colorado corporation, Defendant–Appellee.**

No. 86–1071.

United States Court of Appeals, Tenth Circuit.

Sept. 28, 1988.

Order Granting Rehearing En Banc Dec. 5, 1988.

Jane Rossowski, of counsel, Federal Deposit Ins. Corp., Washington, D.C. (Lawrence F. Bates, of counsel, Federal Deposit Ins. Corp., Washington, D.C., Robert A. Zupkus and Frederick W. Klann of White & Steele, P.C., Denver, Colo., on the briefs), for plaintiff-appellant.

Richard L. Eason (Dean G. Panos, with him on the brief) of Eason, Sprague & Wilson, P.C., Denver, Colo., for defendant-appellee.

Before McKAY, McWILLIAMS, and BALDOCK, Circuit Judges.

I.

McKAY, Circuit Judge.

On June 30, 1982, Bank of Boulder issued a standby letter of credit in the amount of $27,000.00 to Dominion Bank of Denver, a state-chartered commercial bank

with deposits insured by the Federal Deposit Insurance Corporation (FDIC). On September 30, 1983, Dominion Bank was declared insolvent and ordered closed by the Colorado State Banking Commissioner pursuant to Colo.Rev.Stat. § 11–5–102 (1973). Receivership of Dominion Bank was tendered to and accepted by FDIC in accordance with Colo.Rev.Stat. § 11–5–105 (1973) and 12 U.S.C. § 1821(e) (1982). Also on that day, after obtaining court approval, FDIC as receiver (FDIC/Receiver) entered into a Purchase and Assumption transaction (P & A) whereby it sold Dominion Bank to an assuming bank. The assuming bank purchased the "acceptable" assets and assumed the liabilities of Dominion Bank; and FDIC in its capacity as a United States insurance corporation (FDIC/Corporation) purchased the remaining "unacceptable" assets.

One of the "unacceptable" assets acquired by FDIC/Corporation was the letter of credit issued by Bank of Boulder. When FDIC/Corporation subsequently attempted to draw on the letter, Bank of Boulder refused to honor the drafts. Thereafter, FDIC/Corporation brought this action in the United States District Court for the District of Colorado to obtain payment on the letter of credit.

Bank of Boulder filed a motion to dismiss, claiming that (1) the transfer of the letter of credit to FDIC/Corporation was invalid and therefore FDIC/Corporation could not bring an action enforcing the terms of the letter and (2) FDIC/Corporation is proceeding essentially as a receiver of a state bank and therefore can bring an action only in state court.[1] The district court granted Bank of Boulder's motion, determining that the letter of credit, which transferred by operation of law to the state banking commissioner and to FDIC/Receiver, could not be validly transferred to FDIC/Corporation. 622 F.Supp. 288. Specifically, because the letter of credit did not expressly state that it was transferable or assignable, the district court determined that the right to draw on the letter could not be transferred under state law, Colo. Rev.Stat. § 4–5–116(1) (1973), which provides that "the right to draw under a credit can be transferred or assigned only when the credit is expressly designated as transferable or assignable."[2] Also, by its terms, the letter of credit was made subject to the Uniform Customs and Practice for Documentary Credits, International Chamber of Commerce Publication No. 290 (1974 Revision) (UCP). Article 46 of the UCP provides that a letter of credit can be transferred only if it is expressly designated as transferable. Applying these transfer restrictions, the district court concluded that FDIC/Corporation could not acquire or enforce the letter of credit. Rather, FDIC/Receiver would have to bring suit on the letter and could do so only in state court.

On appeal, FDIC/Corporation contends that the district court erred in enforcing the transfer restrictions. According to FDIC/Corporation, federal statutory and common law governs the transfer of assets to FDIC/Corporation in a P & A and dictates that a failed bank's otherwise nontransferable or nonassignable assets may

---

1. When FDIC brings suit in its capacity as receiver of a state bank, asserting the rights of the state bank and its depositors, creditors, or stockholders, FDIC is required to bring suit in state court. This jurisdictional limitation is found in 12 U.S.C. § 1819 (Fourth) (1982), which states in pertinent part: "[A]ny such suit to which the [FDIC] is a party in its capacity as receiver of a State bank and which involves only the rights or obligations of depositors, creditors, stockholders, and such State bank under State law shall not be deemed to arise under the laws of the United States."

2. Although section 4–5–116(1) restricts the transferability of the right to draw on the letter of credit, we note that Colo.Rev.Stat. § 4–5–116(2) (1973) allows the beneficiary (and, we believe, the receiver who steps into the beneficiary's shoes) to assign its right to the proceeds under the letter. Moreover, as confirmed in Colo.Rev.Stat. § 4–5–116(3) (1973), a beneficiary (or its receiver) is entitled to transfer or negotiate drafts or demands properly drawn on the letter. We do not decide, inasmuch as the parties did not address the issues on appeal, whether or not FDIC/Receiver assigned its right to the proceeds under the letter to FDIC/Corporation or whether FDIC/Receiver transferred or negotiated drafts or demands drawn on the letter to FDIC/Corporation.

be purchased and acquired by FDIC/Corporation.

The issue presented is whether FDIC/Corporation can purchase and acquire the right to draw on a letter of credit from FDIC/Receiver in the course of a P & A transaction, notwithstanding that the letter is nontransferable under state law or by its own terms.

## II.

The FDIC is an instrumentality created by Congress to promote stability and restore and maintain confidence in the nation's banking system. *See FDIC v. Philadelphia Gear Corp.*, 476 U.S. 426, 432–35, 106 S.Ct. 1931, 1935–1936, 90 L.Ed.2d 428 (1986); S.Rep. No. 1269, 81st Cong., 2d Sess. 2–3, *reprinted in*, 1950 U.S.Code Cong. Serv. 3765, 3765–66 (FDIC's purpose is to bring depositors sound, effective, and uninterrupted operation of banking system with resulting safety and liquidity of bank deposits). To achieve this objective, FDIC insures bank deposits. One of its primary duties as insurer is to pay depositors when an insured bank fails. *Gunter v. Hutcheson*, 674 F.2d 862, 865 (11th Cir.), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed. 2d 63 (1982), *overruled on other grounds*, *Langley v. FDIC*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987); *FDIC v. Godshall*, 558 F.2d 220, 221 (4th Cir.1977). In fulfilling this duty, FDIC has various options available to it. One option is to close the failed bank, liquidate its assets, and pay the depositors their insured amounts, covering any shortfall with insurance funds. This procedure, however, has several disadvantages. The sight of a closed bank does not promote stability or confidence in the banking system. "Accounts are frozen, checks are returned unpaid, and a significant disruption of the intricate financial machinery results." *Gunter*, 674 F.2d at 865; *accord FDIC v. Merchants National Bank*, 725 F.2d 634, 637 (11th Cir.) (lost jobs, checks returned unpaid, interruption of banking services in community, erosion in public confidence, adverse impact on affiliated or independent banks), *cert. denied*, 469 U.S. 829, 105 S.Ct. 114, 83 L.Ed.2d 57 (1984). Additionally, paying the deposit liabilities of the failed bank may result in a substantial loss to FDIC's insurance fund; and depositors may have to wait for some time to recover even the insured portion of their deposits. Uninsured funds may be irretrievably lost since uninsured deposit liabilities and debts owed to other creditors are paid on a pro rata basis only after the receivership liquidates all of the assets and covers all costs of liquidation. *Merchants National Bank*, 725 F.2d at 637.

To avoid the significant problems associated with full-scale liquidation, FDIC whenever feasible employs a P & A transaction, a dramatically effective and cost-efficient way to protect depositors, the banking system, and the resources of the insurance fund. Generally, a P & A involves three entities: the receiver, the assuming bank, and FDIC as insurer. When FDIC is appointed as receiver, it acts simultaneously in two separate capacities: as receiver of the failed bank and as insurer of the deposits. *See Gunter*, 674 F.2d at 865; *FDIC v. Ashley*, 585 F.2d 157, 160 (6th Cir.1978); *Godshall*, 558 F.2d at 222 n. 4, 223; *Freeling v. Sebring*, 296 F.2d 244, 245 (10th Cir.1961); *FDIC v. Hudson*, 643 F.Supp. 496, 498 (D.Kan.1986).

In a P & A, the assuming bank purchases the failed bank, assuming deposit and other liabilities, and immediately reopens the failed bank with no interruption in vital banking operations and no loss to depositors. *Merchants National Bank*, 725 F.2d at 638; *Gunter*, 674 F.2d at 865. The possibility that depositors will not receive their full deposit is averted since the assuming bank is able to pay deposits upon demand. *FDIC v. Wood*, 758 F.2d 156, 160–61 (6th Cir.), *cert. denied*, 474 U.S. 944, 106 S.Ct. 308, 88 L.Ed.2d 286 (1985). The insurance fund is also protected and the risk of loss to FDIC is generally reduced.

A P & A "must be consummated with great speed, usually overnight." *Gunter*, 674 F.2d at 865, *cited in Langley*, 108 S.Ct. at 401; *see Wood*, 758 F.2d at 160; *Gilman v. FDIC*, 660 F.2d 688, 694 (6th Cir.1981).

Indeed, because speed is the essential predicate and most striking advantage of a P & A, FDIC is able to preserve and realize upon a valuable asset that would otherwise be lost—the going concern value of the failed bank. Also, as mentioned, FDIC is able to avoid interrupting banking services for even one day.

Because time constraints often prohibit an assuming bank from fully evaluating its risks, and so that P & A's are an attractive deal, the assuming bank need only purchase those assets which are of the highest banking quality, i.e., the "acceptable" assets. Consequently, when the assumed liabilities exceed the value of the assets purchased, FDIC/Receiver agrees to pay the assuming bank the difference in cash, less a credit for the going concern value of the failed bank. The cash is paid from FDIC/Corporation's insurance fund in consideration for which FDIC/Corporation acquires the assets not transferred to the assuming bank, i.e., the "unacceptable" assets. As a critical part of the P & A, FDIC/Corporation thereby finances the P & A and facilitates its implementation by providing FDIC/Receiver with the cash needed to consummate the P & A. *See Langley,* 108 S.Ct. at 401 (Court recognizes FDIC/Corporation's important role in financing P & A's); *Merchants National Bank,* 725 F.2d at 637–38.

FDIC/Corporation's purchase of the failed bank's "unacceptable assets" is authorized under 12 U.S.C. § 1823(c)(2)(A) (1982) (emphasis added), which provides: "In order to facilitate ... the sale of assets of such insured bank and the assumption of such insured bank's liabilities by an insured institution ... [FDIC/Corporation] is authorized ... to *purchase any such assets* [of the failed bank]...." Additionally, 12 U.S.C. § 1823(d) (1982) states that a receiver of a failed state bank is "entitled to offer the assets of [the failed bank] for sale to [FDIC/Corporation]" upon receiving permission from the appropriate state authority. *See FDIC v. Abraham,* 439 F.Supp.

1150, 1151–52 (E.D.La.1977). Also under section 1823(d), FDIC/Corporation is entitled to "purchase ... any part of the assets of [a failed bank]."

The transfer of FDIC/Receiver's right, title, and interest in the "unacceptable" assets to FDIC/Corporation for an amount that the assuming bank accepts in lieu of the "unacceptable" assets is a bona fide transfer of assets, not a sham transaction as Bank of Boulder contends. *See Gunter,* 674 F.2d at 874; *Ashley,* 585 F.2d at 160–63; *Godshall,* 558 F.2d at 222–23; *see also FDIC v. Braemoor Associates,* 686 F.2d 550, 553 (7th Cir.1982) (it is unlikely that a state court which approves transfer would have allowed FDIC/Corporation to acquire assets without conveying value), *cert. denied,* 461 U.S. 927, 103 S.Ct. 2086, 77 L.Ed.2d 297 (1983). After the transfer, FDIC/Corporation attempts to enforce and liquidate the "unacceptable" assets to recoup its cash outlay and thereby minimize the loss to the insurance fund. In doing so, FDIC/Corporation may bring actions and prosecute claims in its own right; and, contrary to Bank of Boulder's contention, FDIC/Corporation properly acts in its corporate capacity, not as a receiver of the failed bank. *See Braemoor Associates,* 686 F.2d at 552; *Ashley,* 585 F.2d at 159–64; *Godshall,* 558 F.2d at 222–23; *Hudson,* 643 F.Supp. at 497. Indeed, if no recovery is realized on an asset, FDIC/Corporation generally bears the loss; the failed bank and its depositors, creditors, and stockholders are unaffected. *Godshall,* 558 F.2d at 223 & n. 7 (recovery flows into FDIC's corporate treasury, not to receivership estate; excess recovery, if any, does not change characterization of suit).

For a P & A to be financed by FDIC/Corporation and thereby implemented, the P & A must be less costly than liquidating the failed bank.[3] Specifically, 12 U.S.C. § 1823(c)(4)(A) (1982) states: "No assistance shall be provided ... in an amount in excess of that amount which

---

**3.** A P & A may also be approved in the extraordinary case when FDIC/Corporation determines that the continued operation of an insured bank is "essential to provide adequate banking services in [the] community." 12 U.S.C. § 1823(c)(4)(A) (1982); *see Wood,* 758 F.2d at 161.

[FDIC/Corporation] determines to be reasonably necessary to save the cost of liquidating, including paying the insured accounts of, such insured bank...." This determination must be made by FDIC/Corporation with as much speed as the assuming bank's decision to purchase the failed bank. Consequently, before deciding whether or not to finance a P & A, FDIC/Corporation must be able to rely on and quickly review the failed bank's books and records to estimate which assets will be considered "unacceptable" by the assuming bank and which of those assets ultimately will be collectible, thus estimating the cost of the P & A and comparing that to the expected loss from straight liquidation. The cost of a P & A is obviously increased when FDIC/Corporation is not able to acquire or enforce an "unacceptable" asset because it is determined to be nontransferable.

## III.

### A.

FDIC/Corporation's first contention is that 12 U.S.C. § 1823(c)(2)(A), which authorizes it to purchase any assets of a failed bank in the course of a P & A, contemplates the unrestricted transferability of assets to FDIC/Corporation in a P & A. Thus, according to FDIC/Corporation, section 1823(c)(2)(A) permits it to purchase and acquire assets that are otherwise nontransferable under state law or by their own terms.

In support of its contention, FDIC/Corporation cites *FDIC v. Rectenwall,* 97 F.Supp. 273 (N.D.Ind.1951), a case dealing with the insolvency of a state bank. In *Rectenwall,* the court determined that although an action for personal torts is not assignable under state law, the statutory scheme embodied in the predecessor of section 1823(c)(2)(A) "contemplates the unrestricted transferability of every asset of an insured bank, at least where necessary to accomplish the assumption of its deposit liabilities by another insured bank." *Rectenwall,* 97 F.Supp. at 274; *see also Chatham Ventures, Inc. v. FDIC,* 651 F.2d 355, 358 (5th Cir.1981), *cert. denied,* 456 U.S.

972, 102 S.Ct. 2234, 72 L.Ed.2d 845 (1982); *Hudson,* 643 F.Supp. at 498. The court reasoned: "If this were not so, the usefulness of [the P & A] would largely be defeated...." *Rectenwall,* 97 F.Supp. at 274. The court then concluded that the phrase "purchase any such assets" adequately expresses an intention to make otherwise nonassignable assets transferable to FDIC/Corporation. *Id.* at 275; *accord FDIC v. Main Hurdman,* 655 F.Supp. 259, 267–68 (E.D.Cal.1987) (congressional purpose in creating FDIC would be inhibited by application of state-law strictures).

*FSLIC v. Fielding,* 309 F.Supp. 1146 (D.Nev.1969), *cert. denied,* 400 U.S. 1009, 91 S.Ct. 567, 27 L.Ed.2d 621 (1971), also supports FDIC/Corporation's contention. In *Fielding* the defendants argued that because a chose in action for fraud could not be assigned under state law, an assignment of that asset to FSLIC was invalid. In determining that the validity of the assignment was not controlled by state law, the court stated: "The [FSLIC's] right under [a statute similar to section 1823(c)(2)(A)] to purchase assets of a state-chartered insured savings and loan company requires the application of federal law to determine the transferability of the assets." *Id.* at 1151. Concluding that the assignment was valid, the court reasoned that it was reasonably necessary that the powers granted to FSLIC to "purchase assets of an insured institution and otherwise to protect the depositors and its own position as insurer be construed impliedly to support the acceptance of an assignment of assets to secure repayment of loans made." *Id.*

Although section 1823(c)(2)(A) has considerable force in our concluding that the letter of credit in this case was validly acquired by FDIC/Corporation, we do not rely on this statutory authorization alone but consider FDIC/Corporation's argument regarding the application of federal common law.

### B.

FDIC/Corporation's second contention is that federal common law should be devel-

oped to allow it to purchase the nontransferable assets of a failed state bank in order to facilitate P & A's. To fashion a rule that supercedes conflicting state law,[4] overrides transfer restrictions, and allows for the transferability of otherwise nontransferable assets, we must conclude that (1) a uniform federal rule allowing FDIC/Corporation to acquire nontransferable assets in P & A's is needed to effectuate the interests of the federal deposit insurance program; (2) application of transfer restrictions frustrates specific objectives of the federal deposit insurance program; and (3) application of a federal rule will not disrupt commercial relationships predicated on state law. *See United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 728–29, 99 S.Ct. 1448, 1458–59, 59 L.Ed.2d 711 (1979); *Wood,* 758 F.2d at 159.

First, we are convinced that there is a need for a nationally uniform rule allowing FDIC/Corporation to acquire the nontransferable assets of a failed bank in the course of a P & A. Without such a rule, FDIC/Corporation is subjected to any and all transfer restrictions and varying laws and is faced with an enormous administrative burden in trying to determine whether or not to finance a P & A. Specifically, FDIC/Corporation would have to determine the transferability status of every asset. Because the terms of one asset inevitably differ from the terms of another, and because state laws vary, FDIC/Corporation would not be able to limit its evaluation of the failed bank's assets to a quick review of the bank's records. Instead, FDIC/Corporation would be forced to examine in detail the terms of every asset to determine which state law applies, whether the asset itself restricts transferability, and whether the asset refers to other laws that may impact the asset's transferability. FDIC/Corporation would then have to locate, review, and interpret varying state laws and all laws referenced in the asset to find every possible transfer restriction. To require FDIC/Corporation to do all this under the stringent time constraints of a P & A is asking the impossible. Hence, the P & A method of handling bank failures would be effectively foreclosed. Such a result runs directly counter to the policies behind the creation of the FDIC—promoting stability and confidence in the banking system.

The difficulty with determining, under the time constraints of a P & A, whether or not an asset is transferable is evident in this case. Nothing on the face of the letter of credit indicated that the letter was nontransferable. As mentioned above, under Colorado law, the letter of credit was deemed nontransferable because it did not expressly state otherwise. Also, although the letter was made subject to the UCP, the letter did not state that the UCP limited or even affected transferability. FDIC would have had to review Colorado law, the provisions of the UCP, and all other laws referenced in the letter to conclude that the letter was nontransferable.[5] Additionally, even if the letter of credit had stated on its

---

**4.** We start from the premise that the transferability of the letter of credit in this case is restricted if Colorado law is applied, as the district court determined. We note, however, that although Colorado law places transfer restrictions on letters of credit under normal commercial situations, an argument could be made that Colorado law provides for the transferability of otherwise nontransferable assets to FDIC/Corporation once a state bank fails. In this regard, Colo.Rev.Stat. § 11–5–105(4) (1973) specifies that if FDIC accepts appointment as liquidator of a failed state bank, FDIC/Receiver "has all the powers and privileges provided by the laws of [Colorado] with respect to liquidation of a banking institution, its depositors, and other creditors." Among the statutory provisions granting powers and privileges to a receiver of a state bank, Colo.Rev.Stat. § 11–5–106(1) (1973) provides that "all or any part of the assets of [the failed bank] may be sold to [FDIC/Corporation]." Because section 11–5–106(1) does not expressly state that even the nontransferable assets can be sold to FDIC/Corporation, and because the district court and the parties did not rely on or refer to section 11–5–106(1), we do not make any determinations with regard to the application of section 11–5–106(1) to the specific circumstances of this case.

**5.** In view of our holding in this case, we need not decide whether the restrictions under state law or the UCP were disclosed, apparent, or known to FDIC at the time of the P & A transaction, or whether FDIC should have known about the restrictions or been familiar with the laws making the letter nontransferable.

face that it was nontransferable, FDIC/Corporation still would have had to study the letter in detail, along with every other asset, to determine whether or not the letter could be validly transferred to it. The need for expeditious implementation of a P & A suggests that the FDIC, in either of its capacities, cannot be expected to examine all the assets to locate all possible transfer restrictions. *See Gilman*, 660 F.2d at 694–95; *FDIC v. Stone*, 578 F.Supp. 144, 146 (E.D.Mich.1983) (in rehabilitating a failing bank, FDIC/Corporation "must act quickly and must purchase all of the unacceptable assets of the bank"; FDIC/Corporation cannot be expected to carefully examine the assets before deciding to facilitate the P & A).

A uniform rule permitting FDIC/Corporation to acquire otherwise nontransferable assets in a P & A would eliminate the need for detailed examination of the failed bank's assets and of varying laws. Cost estimates could be made quickly and with greater accuracy, and P & A's could thereby be implemented with fewer risks and the necessary speed. Because the P & A is an extremely valuable tool, such a uniform rule furthers the obvious advantages of P & A's and the interests of the federal deposit insurance program. Indeed, the "free assignability of assets from failing insured banks to the FDIC realistically addresses the frequent need of the FDIC to operate under emergency conditions in rescue situations. A need by the FDIC to determine assignability on an asset-by-asset basis would surely slow a rescue operation down, when dispatch was required." *Main Hurdman*, 655 F.Supp. at 268.

Moreover, P & A's would be more cost effective since transfer restrictions would not preclude recovery to the insurance fund.

Second, we are convinced that application of transfer restrictions frustrates and significantly interferes with the specific objectives of the federal deposit insurance program. As indicated above, a cost-effective P & A is clearly preferred to full-scale liquidation and best serves the interests of the public, the insurance fund, and the depositors and other creditors of the failed bank. If transfer restrictions are enforced against FDIC/Corporation, P & A's become that much more expensive since FDIC/Corporation is not able to collect on the nontransferable assets, reducing recovery to the insurance fund.[6] In light of the congressional mandate that P & A's be less costly than liquidation, increasing the cost of the P & A could very well prevent P & A's in many cases. This adverse consequence results in a potentially enormous cost to the banking system as a whole.

Furthermore, even if a P & A is estimated to be less costly than full-scale liquidation notwithstanding application of transfer restrictions, the fact that FDIC/Corporation is forced to examine every asset in detail and review and analyze varying laws to locate possible restrictions would delay implementation of the P & A, thereby diluting its advantages. Since speed is the essence of P & A's, FDIC/Corporation may have to forgo an exhaustive examination and enter P & A's at a substantial risk of loss of recovery to the insurance fund. Or,

---

**6.** That FDIC/Receiver could retain and liquidate nontransferable assets and accordingly reduce the amount that FDIC/Corporation would have to pay in a P & A defeats the purpose behind FDIC/Corporation's participation in P & A's. FDIC/Receiver must obtain sufficient funds from FDIC/Corporation in exchange for the assets that are not purchased by the assuming bank since the acquired funds are turned over to the assuming bank as part of the P & A agreement. Without sufficient funds, the P & A cannot be adequately financed. Likewise, that FDIC/Receiver—without reducing the cost of the P & A to FDIC/Corporation and thereby obtaining sufficient funds to finance the P & A—could retain or later reacquire the nontrans-

ferable assets and subsequently liquidate those assets defeats the advantages and structure of P & A's. For example, FDIC/Corporation must have the right to enforce the "unacceptable" assets in its own right so that payments are made for the benefit of the insurance fund, not the receivership estate. Further, one of the resulting advantages of a P & A is eliminating the need for constant court supervision that is necessary for a receiver to act. *See Ashley*, 585 F.2d at 163. Also, it would place a burden on the receivership estate and defeat the advantages of P & A's if, after a P & A has been consummated, FDIC/Receiver must attempt to enforce the terms of all nontransferable assets.

FDIC/Corporation may be forced to choose not to implement P & A's because a reasonably accurate cost estimate cannot be made within the limited time demand. "[D]ecisions concerning the appropriate method of dealing with a bank failure must be made with extraordinary speed.... Subjecting the FDIC to the additional burden of considering the impact of possibly variable state law on the rights involved could significantly impair the FDIC's ability to choose between the liquidation and [P & A] alternatives in handling a bank failure." *Gunter,* 674 F.2d at 869.

Third, we are convinced that application of a federal rule permitting FDIC/Corporation to acquire nontransferable assets in the course of a P & A does not disrupt commercial relationships predicated on state law. The rule would come into effect only after an insured bank has failed. Parties cannot reasonably expect to carry on normal commercial relationships at that point, and it is doubtful that the eventuality of bank failure plays a significant role in the ordinary commercial expectations of the parties. Indeed, the potential damage to parties' expectations is far outweighed by the interference with the federal goals of stability and confidence in the national banking system that would result if FDIC/Corporation is not allowed to acquire nontransferable assets in a P & A.

Moreover, application of the rule in this case simply means that FDIC/Corporation, not FDIC/Receiver, is entitled to enforce the terms of the letter of credit. Although the issuer of a nontransferable letter of credit under normal circumstances is only obligated to honor demands for payment made by the beneficiary specifically named in the letter, the issuer certainly may be required to honor a receiver's drafts when the beneficiary bank fails and is put into receivership. Since the issuer must go beyond the letter itself to honor the receiver's drafts or other demands for payment, the mere transfer of the letter to FDIC/Corporation as a part of a P & A, requiring the issuer to pay FDIC/Corporation rather than the receiver, does not place a substantial burden on the issuer. Bank of Boulder contends, however, that the issuer is preju-

diced when it must look beyond the letter itself to assess the validity and propriety of FDIC/Corporation's acquisition of the letter. We do not agree that the issuer is put in a difficult situation, especially in view of the fact that the transfer of the "unacceptable" assets is approved by the state receivership court and is statutorily authorized, and relevant documents are a matter of public record.

Bank of Boulder also contends that when FDIC is appointed receiver of a failed state bank, it can skirt the jurisdictional limitation in 12 U.S.C. § 1819 (Fourth) by transferring assets to itself in its corporate capacity. Our holding, however, is limited to the assets that FDIC/Corporation acquires in the course of financing a P & A. Allowing FDIC to come into federal court in that instance, in view of the overriding benefits of a P & A, does not conflict with the limited jurisdictional exception applicable to suits involving FDIC in its capacity as receiver of a state bank.

As a final point, if the transfer restrictions are recognized in this case, we are persuaded that Bank of Boulder will get an unjustified windfall. Although FDIC/Corporation financed the P & A of Dominion Bank, it will not be able to collect on the letter of credit simply because of the insolvency of Dominion Bank and the nature of the statutorily authorized transaction under which Dominion Bank's assets were liquidated. This loss of recovery to the insurance fund is detrimental to the federal deposit insurance program, frustrates the public policies behind the scheme of national banking insurance, and cannot be justified.

■ We conclude that a rule allowing FDIC/Corporation to purchase and acquire otherwise nontransferable assets in a P & A is appropriate and necessary to give effect to FDIC/Corporation's statutory authorization to finance and facilitate the implementation of P & A's. FDIC/Corporation is properly proceeding in its corporate capacity, not as a receiver, and can enforce the letter of credit in its own right and bring suit against Bank of Boulder in

federal court pursuant to 12 U.S.C. § 1819 (Fourth). The district court erred in enforcing the transfer restrictions against FDIC/Corporation. Accordingly, the district court's order dismissing this action is REVERSED.

BALDOCK, Circuit Judge, dissenting.

The majority ventures beyond the letter of credit involved in this case and concludes that the grant of authority which allows the FDIC-corporation to purchase assets from a failed bank, 12 U.S.C. § 1823(c)(2)(A), also allows the FDIC-corporation to purchase and acquire assets of a failed bank free of express transfer restrictions created by state law or by agreement. The majority does not merely rest its holding on its reading of the statute, however. Instead, the majority enacts a new rule of federal common law allowing the FDIC-corporation to purchase and acquire *any* asset of a failed bank free of express transfer restrictions.

What is striking about much of the majority opinion is its resemblance to a legislative committee report, but without supporting congressional testimony. The short record in this case contains no evidence to support the majority's prescriptive discussion about the mechanics of asset disposition at a failed bank and, in particular, about the necessity and advantages of allowing the FDIC-corporation to take *any* asset free of express transfer restrictions. These matters, which involve legislative and executive policy determinations, were not addressed below.

I respectfully dissent for several reasons. First, in creating new law, the majority overlooks the unique nature of the asset involved in this case, a letter of credit (documentary credit). A letter of credit is a widely used commercial instrument that traditionally has not been assignable in the absence of an express provision allowing assignment. Second, the majority's holding is far too broad. Each type of bank asset should turn on its own facts and circumstances; we simply have no way of foreseeing whether every asset is properly transferable despite transfer restrictions to the contrary. Third, the majority ventures

outside the record for its rationale. There is no evidence concerning the FDIC-corporation's customary procedure in a purchase and assumption transaction. There is insufficient evidence about how the FDIC evaluated the letter of credit before and after Dominion Bank failed. This is not a situation where the facts may be assumed with confidence; indeed, the parties do not agree as to all relevant facts. Fourth, I view the majority's approach as too great an incursion into international trading convention, state law and private contractual arrangements. Whether a letter of credit is transferable to the FDIC-receiver by operation of law is a matter well-suited for state court resolution given the express limitation on federal jurisdiction contained in 12 U.S.C. § 1819 (Fourth). I would affirm the district court.

There are two common types of documentary credits, commercial and standby letters of credit. A commercial letter of credit is used in connection with the purchase of goods. A standby letter of credit is used to insure payment of a money obligation in the event of a default. *Federal Deposit Ins. Corp. v. Philadelphia Gear Corp.*, 476 U.S. 426, 428, 106 S.Ct. 1931, 1933, 90 L.Ed.2d 428 (1986). In a traditional letter of credit transaction, the customer (applicant, account party or buyer) enters into an agreement with the issuer (bank) whereby the issuer promises to pay the beneficiary (seller) upon proper presentation of documents and full compliance with the terms and conditions of the letter of credit. *Arbest Constr. Co. v. First Nat'l Bank & Trust Co. of Oklahoma City*, 777 F.2d 581, 583 (10th Cir.1985). Three separate relationships are involved: 1) one between the customer and the beneficiary based on an underlying agreement (e.g., sale of goods by beneficiary to customer or extension of credit by beneficiary to customer) which imposes a financial obligation on the customer; 2) one between the customer and the issuer in which the issuer agrees to issue the letter of credit in favor of the beneficiary and the customer agrees to repay the issuer; and 3) one between the issuer and the beneficiary in which the beneficiary may draw on the letter of credit

upon presentation of proper documents and compliance with the terms of the letter. *Id.* The letter of credit allows the beneficiary to rely on the issuer's credit, rather than on the customer's, for satisfaction of the underlying financial obligation of the customer to the beneficiary. *Leney v. Plum Grove Bank,* 670 F.2d 878, 881 (10th Cir.1982).

Several important features of the letter of credit make it commercially attractive. The relationship between the issuer and the beneficiary is independent of the underlying transaction between the customer and the beneficiary. 1974 UCP, General provisions and definitions c.; *Colorado Nat'l Bank of Denver v. Board of County Comm'rs of Routt County,* 634 P.2d 32, 37 (Colo.1981). Thus, all parties concerned deal in documents, not in goods or the subject matter of the underlying transaction between the customer and the beneficiary. 1974 UCP art. 8b. If the documents presented for payment or to draw on the letter of credit comply, on their face, with the terms and conditions of the letter of credit, the issuer will honor the letter of credit and the customer is required to reimburse the issuer. 1974 UCP art. 3a, 8b.

The documentary credit in this case is a standby letter of credit. A customer of the Bank of Boulder, Mr. Reed, obtained the letter of credit from the issuer, the Bank of Boulder, in favor of the beneficiary, Dominion Bank. Dominion Bank was entitled to draw on the credit by a sight draft accompanied by a certification by Dominion Bank that the amount drawn represented amounts due on a promissory note in which Mr. Reed was the maker and Dominion Bank was the payee. The FDIC, in its capacity as liquidator of Dominion Bank, attempted to draw on the credit after furnishing a letter certifying that the amount of the drawing represented unpaid principal and interest due and owing on Mr. Reed's note.

Article 5 of the Uniform Commercial Code (UCC) concerns letters of credit and would apply to this letter of credit in the absence of a provision indicating otherwise. *See* Colo.Rev.Stat. §§ 4–5–101 to 4–5–117 (art. 5 of the UCC as codified in Colorado), 4–5–102(3) (scope of art. 5) (1973). There is another widely used source of rules pertaining to letters of credit, however. The International Chamber of Commerce has developed the Uniform Customs and Practice for Documentary Credits, "a code of practice which is recognized by banking communities in 156 countries." Int'l Chamber of Commerce (ICC), Pub. No. 305 Guide to Documentary Credit Operations 1 (1978). Documentary credits are used widely in international trade and involve "thousands of transactions and billions of dollars every day in every part of the world." *Id.* It is essential that there be a standard and consistent application of the rules concerning documentary credits.

The letter of credit in this case expressly states that it is subject to the Uniform Customs and Practice for Documentary Credits (1974 Revision) (1974 UCP). *See* Int'l Chamber of Commerce, Pub. No. 290 Documentary Credits (1975).[1] Thus, the 1974 UCP governs the rights of the parties. The UCP provides that: "A credit can be transferred only if it is expressly designated as 'transferable' by the issuing bank." 1974 UCP art. 46(b). "It should be noted that a credit would only be issued as a transferable one on the specific instructions of the applicant. This would mean that both the credit application form and the credit itself must clearly show that the credit is to be transferable." Int'l Chamber of Commerce, Pub. No. 305 Guide to Documentary Credit Operations 31 (1978). If a credit is not transferable, the beneficiary still has the right to assign the proceeds in conformity with applicable law. 1974 UCP art. 47.[2] These provisions of the

---

1. A 1983 revision of the UCP is available. The provision of the 1974 UCP concerning transferability of a letter of credit that applies in this case, art. 46(d), is now found in art. 54(b) of the 1983 UCP, but the substance remains the same. Int'l Chamber of Commerce (ICC), Pub. No. 411 Documentary Credits—UCP 1974/1983 Revisions Compared and Explained 82–84 (1984).

2. The UCC contains the "applicable law" concerning the assignment of proceeds. Colo.Rev. Stat. § 4–5–116(2) (1973 & 1987 Supp.) provides:

UCP are similar to those found in art. 5 of the Uniform Commercial Code. Section 4–5–116(1) provides that "[t]he right to draw under a credit can be transferred or assigned only when the credit is expressly designated as transferable or assignable." Colo.Rev.Stat. § 4–5–116(1). The beneficiary, however, may assign his right to proceeds. *Id.* § 4–5–116(2) (1973 & 1987 Supp.).

The difference between assignment of a letter of credit and assignment of its proceeds is that assignment of the letter allows the assignee to execute and sign drafts which the issuer must honor. *Shaffer v. Brooklyn Park Garden Apts.,* 311 Minn. 452, 250 N.W.2d 172, 177 (1977). If a letter of credit is not expressly assignable, the assignee only has the right to proceeds, that is "the right to receive drafts properly drawn by the beneficiary." *Id.*

The rule concerning assignability of letters of credit involves two competing policies. J. Dolan, The Law of Letters of Credit ¶ 10.02 (1984). As a general proposition, the law does not favor restraints on alienation of property. But the law also does not favor the delegation of contract rights and liabilities which are inherently personal. Documentary credit law seeks to accommodate both policies by allowing assignment when there is an express designation; in the absence of an express designation, the beneficiary may still assign the right to proceeds. Assignability is an important attribute that may be bargained for—a beneficiary is free to insist that a letter of credit contain language making it assignable or transferable by operation of law. *See Hyland Hills Metropolitan Park and Recreational Dist. v. McCoy Enter-*

*prises,* 38 Colo.App. 23, 554 P.2d 708 at 710 (1976) (if the beneficiary is not satisfied with the terms of the credit, it could require the customer to supply another letter containing other terms). On the other hand, a customer may be apprehensive concerning "presentation of sensitive documents by a person whom he may not trust." J. Dolan, The Law of Letters of Credit ¶ 10.02 (1984).

An express designation of assignability protects that customer. Satisfactory performance of the terms of the credit depends upon proper presentation of documents by the beneficiary. In the absence of express consent, the customer's protection should not be diminished by a change in the beneficiary presenting the documents. *See Pastor v. Nat'l Republic Bank of Chicago,* 76 Ill.2d 139, 28 Ill.Dec. 535, 538, 390 N.E.2d 894, 897 (1979). In other words, requiring assignment in the absence of an express provision may alter the risk among the parties. *See* Official Comment 1 to Colo.Rev.Stat. § 4–5–116 (recognizing that the customer "may be deprived of real and intended security" if the beneficiary may delegate performance by assignment). There are a number of reasons why a customer may view assignability with disfavor, such as the potential for forgery of documents or the possibility that an unknown assignee may present documents which comply, yet not perform the underlying agreement satisfactorily.

Another reason for requiring an express designation of assignability lies in the doctrine of independence. In deciding whether to honor a draft, the issuer should look only at whether the documents and draft presented conform to the letter of credit.

Even though a credit specifically states that it is nontransferable or nonassignable, the beneficiary may before performance of the conditions of the credit assign his rights to proceeds. Such an assignment is an assignment of an account under article 9 of this title on secured transactions and is governed by that article, except that:

(a) The assignment is ineffective until the letter of credit or advice of credit is delivered to the assignee, which delivery constitutes perfection of the security interest under article 9 of this title; and

(b) The issuer may honor drafts or demands for payment drawn under the credit until it receives a notification of the assignment signed by the beneficiary which reasonably identifies the credit involved in the assignment and contains a request to pay the assignee; and

(c) After what reasonably appears to be such a notification has been received, the issuer may without dishonor refuse to accept or pay even to a person otherwise entitled to honor until the letter of credit or advice of credit is exhibited to the issuer.

The relationship between the customer and the beneficiary is independent of the relationship between the issuer and beneficiary. Without an express designation of assignability, however, the issuer must look behind the documents in deciding whether to honor a draft. This involves reference to the underlying transaction between the customer and the beneficiary to determine whether performance has occurred, thereby defeating the purpose of a letter of credit. Colorado repeatedly has recognized the importance of the independence doctrine. *Colorado Nat'l Bank of Denver v. Board of County Comm'rs of Routt County*, 634 P.2d at 40; *East Bank of Colorado Springs v. Dovenmuehle, Inc.*, 196 Colo. 422, 589 P.2d 1361, 1365 (1978), *aff'g*, 38 Colo.App. 507, 563 P.2d 24, 28 (1977); *Hyland Hills Metropolitan Park and Recreational Dist. v. McCoy Enterprises*, 38 Colo.App. 23, 554 P.2d 708, 710 (1976).

Colorado also has recognized the importance of the strict compliance doctrine. Colo.Rev.Stat. § 4-5-114; *Colorado Nat'l Bank of Denver v. Board of County Comm'rs of Routt County*, 634 P.2d at 40 ("To maintain the commercial vitality of the letter of credit device, strict compliance with the terms of the letter of credit is required."). We have noted that the issuer's duty to the beneficiary is a limited one—if the documents and draft conform, the issuer must honor the draft, if the documents and draft do not conform, the issuer must not honor the draft. *Arbest Contr. Co. v. First Nat'l Bank & Trust Co.*, 777 F.2d at 584–85.

Several cases have considered whether a letter of credit not designated as assignable may nevertheless be transferred to a successor entity. In *American Bell Int'l, Inc. v. Islamic Republic of Iran*, 474 F.Supp. 420, 423–24 (S.D.N.Y.1979), the customer sought to enjoin the issuer from honoring a demand for payment under a letter of credit because a successor government had taken power after the letter of credit was executed. In rejecting this argument, the district court relied on the international law principle that a successor government succeeds to the contract rights of the predecessor government. *Id.* at 423; *accord American Bell Int'l v. Manufacturers Hanover Trust Co.*, N.Y.L.J., Mar. 29, 1979, at 6, col. 7 (N.Y.Sup.Ct.1979), *aff'd mem.*, 70 A.D.2d 830, 418 N.Y.S.2d 551 (N.Y.App.Div.1979). The district court determined that a demand by the successor government would sufficiently comply with the terms of a letter of credit. The district court was concerned that an opposite holding would elevate form over substance and would subject international financial commitments to the "vicissitudes of political power." 474 F.Supp. at 424.

In *Temple–Eastex Inc. v. Addison Bank*, 672 S.W.2d 793 (Tex.1984), *rev'g*, 665 S.W.2d 550 (Tex.App.1984), a parent corporation sought to enforce a standby letter of credit which had been distributed to it upon dissolution of a wholly-owned subsidiary. The letter of credit was silent as to transferability. The Texas Supreme Court held that the parent had succeeded to the rights of the subsidiary in the letter of credit based upon a state statute which provided that shareholders succeeded to the rights and claims existing prior to dissolution. *Id.* at 796. The court also held that the issuer bank should have been on inquiry notice concerning the rights of the parent based upon the circumstances including an explanation by the parent. *Id.* Finally, the court determined that a demand letter would suffice for a sight draft required by the letter of credit. *Id.* at 796–97. The case demonstrates little regard for strict compliance doctrine. The decision by the court of appeals is more in accord with traditional letter of credit principles.

In *In re Swift Aire Lines, Inc.*, 20 B.R. 286, 288–89 (Bankr.C.D.Cal.1982), *rev'd*, 30 B.R. 490 (9th Cir.1983), the trustee in bankruptcy sought to enforce a nonassignable letter of credit in which the debtor was the beneficiary. The issuer declined to recognize the trustee as a beneficiary because the documents presented by the trustee did not strictly comply with the terms of the letter of credit. The debtor beneficiary had not signed the draft and other necessary documents, as the trustee of the bankruptcy estate had succeeded the debtor. The

bankruptcy court rejected this argument, reasoning that the federal law of bankruptcy would override the state principle of strict compliance and that form would be elevated over substance if the trustee were not allowed to enforce the letter of credit. *Id.* at 288.

The Ninth Circuit reversed the bankruptcy court, holding that state law did not conflict with federal bankruptcy law and that the latter "did not give the trustee the power to automatically enforce payment thereunder if state law requiring strict compliance of tender documents would dictate otherwise." *In re Swift Aire Lines, Inc.*, 30 B.R. at 495. In so deciding, the court emphasized the need for certainty in commercial transactions using letters of credit:

> Rules relating to the treatment of documents, such as letters of credit, providing for payments of funds in a complex commercial transaction have developed from a long history of pragmatic experience. This experience has shown the need for specificity in the conditions for payment and a corresponding need for absolute compliance with these specific conditions. In this manner, the customer, issuer, and beneficiary will have no doubts where they stand.

*Id.* at 496. The strict compliance doctrine enables the issuer to avoid liability based on wrongful honor and wrongful dishonor; when documents of questionable authority are presented the issuer is justified in not honoring the letter of credit. *Id.* at 496–497. The court distinguished the result of *American Bell* as controlled by international law principles; in domestic transactions the beneficiary's rights in a letter of credit vest solely in the named beneficiary absent proper assignment. *Id.* at 495.

In *Pastor v. National Republic Bank of Chicago*, 76 Ill.2d 139, 28 Ill.Dec. 535, 390 N.E.2d 894 (1979), *aff'g*, 56 Ill.App.3d 421, 14 Ill.Dec. 74, 371 N.E.2d 1127 (Ill.App. 1977), the customer sought to prevent the liquidator of an insurance company beneficiary from drawing upon a letter of credit in favor of the insolvent company. The customer contended that the letter of credit could not be transferred. The Illinois Supreme Court determined that the UCC's restriction on assignment did not apply because a voluntary transfer was not involved, rather the beneficiary's right to draft on the letter of credit was transferred to the liquidator by operation of law under a specific statute and by court order. *Id.* 28 Ill.Dec. at 539–40, 390 N.E.2d at 898–99. The court emphasized that its holding was one of "narrow scope" confined to a situation when the beneficiary had performed the underlying obligation to the customer and all that remained was for the beneficiary to recover on the credit. *Id.*

The approach taken in *Pastor* has been criticized as destroying the independence of the letter of credit because the issuer must be concerned with the original beneficiary's performance. J. Dolan, The Law of Letters of Credit ¶ 10.03[3] (1984). Erosion of the principles of independence and strict compliance reduce the certainty associated with letters of credit.

> The issuer of a credit reasonably expects to receive a draft drawn by the beneficiary. These cases force the issuer to decide whether concerns of international law, insurance liquidation law and bankruptcy law excuse strict compliance with terms of the credit. The burden of that inquiry is far greater than the burden the strict-compliance rule imposes on the issuer. Under the rule of these cases, issuers must invoke legal concepts and may have to litigate; under the strict compliance rule, the issuer need only determine whether the documents comply on their face with the terms of the credit.

*Id.* In the case before the court, the majority has determined that policy concerns outweigh deference to established law regarding the transferability of letters of credit. While it is possible that Colorado might recognize the initial transfer of the letter of credit (to the FDIC-receiver) on the authority of *Pastor*, recognizing a subsequent transfer (to FDIC-corporation) would further impair the strict compliance principle.

In deciding that 12 U.S.C. § 1823(c)(2)(A) allows FDIC-corporation to purchase or ac-

quire assets free of transferability restrictions, the majority relies upon cases involving the assignability of tort actions to the FDIC against those who may have contributed to the bank's insolvency. *See FDIC v. Hudson,* 643 F.Supp. 496 (D.Kan.1986) (tort action against bank's officers, directors and employees); *FDIC v. Main Hurdman,* 655 F.Supp. 259 (E.D.Cal.1987) (tort action against accounting firm which prepared allegedly false financial statements for borrower); *FSLIC v. Fielding,* 309 F.Supp. 1146 (D.Nev.1969) (suit against officers, directors and others associated with savings and loan association); *FDIC v. Rectenwall,* 97 F.Supp. 273 (N.D.Ind. 1951) (tort action against cashier who allegedly paid drafts when drawer's accounts were insufficient to cover the drafts). The only case cited by the majority which did not involve a tort or quasi-tort action, *Chatham Ventures, Inc. v. FDIC,* 651 F.2d 355 (5th Cir.1981), *cert. denied,* 456 U.S. 972, 102 S.Ct. 2234, 72 L.Ed.2d 845 (1982), also did not involve a state law prohibition on assignment of the note in question. The court in that case specifically noted that it "need not decide what result would obtain if state law made the FDIC's rights worthless." *Id.* at 358 n. 4.

The statement in *FDIC v. Rectenwall,* 97 F.Supp. at 274, that the language of § 1823(c)(2)(A) "contemplates the unrestricted transferability of every asset of an insured bank, at least where necessary to accomplish the assumption of its deposit liabilities by another insured bank," simply is too broad. For example, it is unlikely that a personal service contract would be assignable. While tort actions for the malfeasance of bank officers and directors may be assignable as a matter of federal law, there is no requirement that federal law must supply a rule of decision at odds with uniform state law. *See United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 728, 99 S.Ct. 1448, 1458, 59 L.Ed.2d 711 (1979) (holding that a national rule is not needed to determine the priority of liens arising from federal lending programs). When there is a uniform rule of state and international law

governing commercial transactions, only the most compelling reasons, not present in this case, ought to overturn that rule.

Whether to follow state law or create federal common law depends upon several factors including: 1) the need for national uniformity; 2) whether application of state law would interfere with federal program objectives; and 3) whether application of a federal rule would disrupt commercial relationships based on state law. *Id.* The majority concludes that federal common law is needed not only in this case, but also in all cases involving the FDIC and transfer restrictions on bank assets. Because the above criteria must be applied to specific facts, I only address the contentions of the majority opinion insofar as they concern letters of credit. Applying these criteria to this case, I do not agree with the majority's conclusion.

The majority's conclusion that there is a need for a nationally uniform rule concerning the transferability of letters of credit is seriously undercut by the presence of a uniform rule prohibiting assignment, absent an express provision, in both the UCC and UCP. The UCC's provision concerning assignment, § 5–116, has been adopted in all 50 states, 2A Uniform Laws Ann. § 5–116 (Master ed. 1977 & 1988 Pamp.), and the UCP is used throughout the world. There is little mystery concerning letters of credit and the need for an express designation of assignment. *See, e.g.,* 12 C.F.R. § 208.8(d) (regulation of letters of credit for State banks which are members of the Federal Reserve System); American Law Institute (ALI), Uniform Commercial Code Official Draft § 5–115 & Comment 1, 531–32 (1952) (adopting current rule); 6 W. Hawkland & T. Holland, UCC Series §§ 5–116:01, 5–116:02 (1984); 2 A. Squillante & J. Fonesca, The Law of Modern Commercial Practices § 7:32 (rev. ed. 1981); J. White & R. Summers, Uniform Commercial Code § 18–9 (2d ed. 1980). Thus, the majority is simply wrong when it speculates about the difficulty of determining whether this letter of credit was transferable.[3] *See*

---

**3.** The letter of credit at issue is four short paragraphs and only references the UCP.

Majority Opinion at 1138–1140. The process described by the majority to evaluate transferability restrictions is without application to this case,[4] yet that error forms the premise for the majority's conclusion that the FDIC cannot be expected to examine bank assets quickly for transferability restrictions. By deciding this issue as a matter of law, the majority conveniently dispenses with a need for factual inquiry in this or any other case. See Majority Opinion at 1139 n. 5 (no need to decide whether the FDIC knew or should have known that the letter of credit was not assignable).

If any inference can be made, it is that the transfer restrictions concerning this asset were known prior to its being designated an "unacceptable" asset. After all, this asset is a standby letter of credit issued by a solvent bank. The FDIC is not without familiarity concerning standby letters of credit. See, e.g., 12 C.F.R. § 337.2 (standby letters of credit and unsafe banking practices). Moreover, the majority's analysis completely fails to address the FDIC's power to examine bank assets regularly and prior to bank failure.[5] See 12 U.S.C. § 1819 (Eighth). I cannot agree that changing the rule concerning assignability of letters of credit would 1) "eliminate the need for detailed examination of the failed bank's assets and of varying laws," or 2) enable the FDIC to prepare quicker and more accurate cost estimates concerning a failed bank, or 3) allow the FDIC to implement a purchase and assumption of a failed bank rather than liquidation. See Majority

Opinion at 1139, 1141. There simply is no support in the record for these claimed advantages because there is no trial evidence concerning the importance of transfer restrictions on this or any other asset acquired by FDIC-corporation. Existing law concerning letters of credit is sufficiently uniform so as to obviate the need for an independent federal rule.

Nor can the existing law be said to interfere with the objectives of the federal deposit insurance program in any significant way. The record is devoid of any "potentially enormous cost to the banking system," id. at 1140, if the FDIC-corporation is not allowed a special exception to the general rule that a letter of credit is not assignable unless it says so. It is apparent that the majority seeks to reach a result that will allow recovery by the FDIC without giving due consideration to the unsettling influence such a precedent will have on state law.

This is not the type of problem that is so vital to the federal deposit insurance program that it requires "a high degree of inventiveness from the courts." Int'l Union, United Automobile, Aerospace & Agricultural Implement Workers of America AFL–CIO v. Hoosier Cardinal Corp., 383 U.S. 696, 701, 86 S.Ct. 1107, 1111, 16 L.Ed.2d 192 (1966). In this case, assuming Colorado would allow transfer by operation of law, the FDIC-receiver could assign the proceeds of the letter of credit to the FDIC-corporation.[6]

---

**4.** The majority states:

Instead, FDIC/Corporation would be forced to examine in detail the terms of every asset to determine which state law applies, whether the asset itself restricts transferability, and whether the asset refers to other laws that may impact the asset's transferability. FDIC/Corporation would then have to locate, review, and interpret varying state laws and all laws referenced in the asset to find every possible transfer restriction. To require FDIC/Corporation to do all this under the time constraints of a P & A is asking the impossible.

Majority Opinion at 1139. This description finds no support in the record.

**5.** It is this factor which makes me seriously question the majority's conclusion that the FDIC operates under time constraints which would

make it impossible to evaluate the transferability of assets. Bank examinations are performed at least annually, and more frequently if circumstances require. The FDIC acquires some familiarity with a bank's assets during this process, particularly if a bank has been classified as a problem bank and is subject to more frequent examinations. After a decision has been made to close a bank, the bank and its assets will be reviewed prior to any meeting of proposed bidders. In short, the FDIC will have some familiarity with most of the bank's assets prior to a purchase and assumption transaction.

**6.** Thus, the FDIC–Receiver would not be required to "retain and liquidate" the letter of credit as assumed by the majority at 1140 n. 6. Footnote 6 of the majority opinion, listing the purported disadvantages of such a procedure,

Allowing a letter of credit to be assigned in the absence of an express provision would disrupt commercial relationships predicated on state law. The issuer is forced to look beyond the letter of credit and review documents with no objective standard for determining whether a valid assignment has occurred. The majority is quite willing to impose this unanticipated burden on a commercial issuer, yet is most concerned with the possibility that the FDIC-corporation might have to review a bank asset for transferability restrictions (if it has not already done so). Given the potential liability for wrongful honor of a letter of credit, the majority has imposed a significant burden on an issuer and has interfered with the commercial expectations of the customer.

The majority's final reason for enforcing this letter of credit in the hands of FDIC-corporation is not convincing. The majority concludes that the Bank of Boulder will get an unjustified windfall if the letter of credit is not assignable. On this record, we simply have no way of knowing whether the Bank of Boulder has been or will be paid by its customer if the letter of credit is honored. Moreover, we cannot say with certainty that the FDIC-corporation could not collect on the underlying note if the letter of credit is not honored.

I would affirm the district court's decision that this matter was suitable for state court resolution. In that way, the courts of Colorado could have decided whether the letter of credit was transferable by operation of law to the FDIC-receiver. If so, the FDIC-receiver could have assigned the proceeds to FDIC-corporation. If the letter of credit was not transferable, the FDIC-corporation could then sue on the underlying note. Because these options are available, I simply do not see the need to expand federal law into a commercial transaction involving a letter of credit. Moreover, I expect that the broad holding of the majority will have unanticipated application far beyond the facts of this case; I do not share the majority's confidence in our ability to decide cases in the absence of record facts.

## ORDER

This matter comes on for consideration of appellee's petition for rehearing and suggestion for rehearing en banc.

Upon consideration whereof, the petition for rehearing is denied by the panel that rendered the decision sought to be reheard.

Further, a vote having been taken on the suggestion for rehearing en banc, *see* Fed. R.App.P. 35(b), rehearing en banc is granted. Circuit Judges William J. Holloway, Jr., Monroe G. McKay and James K. Logan voted to deny rehearing en banc. Circuit Judge Robert H. McWilliams, who as a member of the hearing panel voted to deny the petition for rehearing, did not participate in consideration of the suggestion for rehearing en banc. Circuit Judge David M. Ebel did not participate in consideration of the suggestion for rehearing en banc.

The appellant shall file a supplemental brief on rehearing on or before January 14, 1989. Within 30 days after service of appellant's brief, appellee shall file a supplemental brief on rehearing. Within 14 days after service of appellee's supplemental brief, appellant may file a reply brief. All supplemental briefs shall be subject to the page limitations set forth in 10th Cir.R. 28.3. Counsel will be notified when oral argument on rehearing is set.

appears to assume that funds from this letter of credit would be used to complete *this* purchase and assumption transaction. This seems unlikely as the FDIC was appointed receiver for the bank on September 30, 1983, and the FDIC–Corporation did not attempt to draft on the letter of credit until October 5, 1984, based upon a default which occurred August 5, 1984.