(No. 50492.—

LOUIS PASTOR, Appellant, v. NATIONAL REPUBLIC BANK OF CHICAGO, Appellee. (Thomas A. Harnett, Appellee).

*Opinion filed June 1, 1979.*

142

Barbara B. Hirsch, of Chicago, for appellant.

James G. McConnell and Stephen J. Friedman, of Chicago (Rooks, Pitts, Fullagar & Poust, of counsel), for appellee Thomas A. Harnett.

MR. JUSTICE RYAN delivered the opinion of the court:

Plaintiff, Louis Pastor, procured the issuance of an

irrevocable letter of credit by defendant, National Republic Bank of Chicago, in favor of Summit Insurance Company of New York (Summit). Pastor is affiliated with Associated Surety Agents, Inc. (Associated), which is in the business of acting as insurance agent, and in that capacity sought to represent Summit. Pastor procured the issuance of the letter of credit as stated therein "to facilitate authorization of Associated Surety Agents, Inc. to act as agent for Summit ***." The credit authorizes Summit to draw on the defendant bank by sight draft from time to time, up to an aggregate amount of $25,000, for the recovery of any deficit balance existing between Summit and Associated. On May 25, 1975, Summit was placed in liquidation by a court order in New York. The Superintendent of Insurance of the State of New York was appointed liquidator and vested with title to all property, contracts and rights of action of Summit. Thereafter, the liquidator drew a sight draft for $25,000 on the defendant bank under the irrevocable credit it issued to Summit. Pastor filed a suit against the bank in the circuit court of Cook County seeking to enjoin payment of the sight draft. A temporary restraining order and later a preliminary injunction were issued enjoining the payment of the draft drawn against the credit. Thomas A. Harnett, Superintendent of Insurance for the State of New York, petitioned the court for leave to intervene. On March 2, 1976, the circuit court of Cook County denied Harnett's petition, ordered the circuit court orders to remain in full force, and found that the denial of the motion to intervene was a final order and that there was no just reason to delay enforcement or appeal. The appellate court reversed and remanded. (56 Ill. App. 3d 421.) We granted Pastor's petition for leave to appeal. The terms used with relation to letters of credit are those defined in section 5—103 of the Uniform Commercial Code (Ill. Rev. Stat. 1975, ch. 26, par. 5—103).

The credit which the bank issued did not expressly state that it was transferable or assignable. Concerning the required documentary support for the sight drafts drawn against the credit it provided:

> "All drafts drawn under this Letter of Credit must be accompanied by your official statement setting forth the amount of the loss, our agreement description and the amount of deficit, and your calculation *** of the loss or deficit."

The sight draft for $25,000 was drawn in favor of "Summit Insurance Company of New York in Liquidation" and was accompanied by a letter signed by the Associate Special Deputy Superintendent of Insurance for the State of New York which stated that a deficit balance existed between Associated Surety Agents, Inc., and Summit in the amount of $612,655.98 as indicated on the enclosed calculation. The calculations enclosed covered a period of time "from inception to 6/30/75," and the calculation simply stated a "summary of income and outgo" for the period.

Section 5—116(1) of the Uniform Commercial Code (Ill. Rev. Stat. 1975, ch. 26, par. 5—116(1)) provides:

> "The right to draw under a credit can be transferred or assigned only when the credit is expressly designated as transferable or assignable."

Pastor contends that since the credit did not expressly provide that it was transferable or assignable, Summit alone was entitled to its benefits and to draw drafts against it and that this right could not be exercised by the liquidator, who, Pastor contends, is a transferee or assignee of the credit. Pastor also contends that the order of the New York court terminated the contractual relationship existing between Summit and Associated and thereafter the credit issued by the bank could not be drawn against it. Pastor also contends that the liquidator failed to comply with a condition of the credit in that he failed to

furnish a proper accounting which reflected the amount of Summit's loss, but instead furnished only its own statement and calculation of the loss.

The law governing letters of credit was developed "when those devices were used primarily as a financial adjunct to a contract for the sale of goods. Today letters of credit are being used as a financial adjunct to a range of contracts that is as wide as the requirements of a sophisticated and developing economy." (Harfield, *Code, Customs and Conscience In Letter-of-Credit Law*, 4 U.C.C. L.J. 7, 9 (1971).) The traditional letter of credit used in connection with a contract for the sale of goods customarily was issued by a bank or other financially responsible entity (issuer) at the request of a buyer (customer) addressed to the seller of the goods (beneficiary) stating that the beneficiary could draw on the issuer for a specified amount upon compliance with conditions set forth in the body of the letter. The conditions usually were the presentation of a sight draft accompanied by certain documentation, usually including a bill of lading. The issuer, upon payment of the draft, then had a claim against the buyer (customer), who, upon payment to the issuer, received the documents which enabled him to procure the goods. The function of the traditional or commercial letter of credit was to finance the movement of goods in commerce and to insure the seller that he would be paid. See generally 2 W. Hawkland, A Transactional Guide to the Uniform Commercial Code sec. 2.37 *et seq.* (1964); Harfield, *Code Treatment of Letters of Credit*, 48 Cornell L.Q. 92 (1962); Mentschicoff, *How to Handle Letters of Credit*, 19 Bus. Law. 107 (1963); Annot., 35 A.L.R.3d 1404 (1971).

In recent years, another distinct use of the letter of credit has emerged, accomplishing results previously obtained by the use of such devices as performance bonds, escrow agreements, and various forms of guaranty arrange-

ments. (Verkuil, *Bank Solvency and Guaranty Letters of Credit,* 25 Stan. L. Rev. 716, 721 (1973).) The use of the letter of credit in this capacity is referred to as a "guaranty" or "stand-by" letter of credit. Unlike the sales or traditional letter of credit, which obligates the issuer to pay in the ordinary course of a business transaction, the guaranty or stand-by letter of credit obligates the issuer to pay in the event of a default by one who procured its issuance. (Jarvis, *Standby Letters of Credit—Issuers' Subrogation and Assignment of Rights—Part 1,* 9 U.C.C. L.J. 356, 359 (1977); Joseph, *Letters of Credit: The Developing Concepts and Financing Functions,* 94 Banking L.J. 816 (1977); see generally Campbell, *Guaranties and the Suretyship Phases of Letters of Credit,* 85 U. Pa. L. Rev. 175 (1936).) Although the use of letters of credit is often referred to as being in the nature of a guaranty or a suretyship arrangement, it does not assume the legal significance of either. Under the letter of credit the issuer is bound in the first instance to pay the beneficiary. It is an individual undertaking of the issuer to pay the beneficiary, and the obligation is not subject to the various defenses available to a guaranty or a surety undertaking. J. White & R. Summers, Uniform Commercial Code sec. 18—2 (1972).

Article 5 of the Uniform Commercial Code (Ill. Rev. Stat. 1975, ch. 26, par. 5—101 *et seq.*) is not limited in its applicability to any specific type or use of a letter of credit. The language used clearly indicates the intention of the drafters that its terms apply to "guaranty" or "stand-by" credits, as well as to traditional or sales credits. Whatever the nature of the credit, section 5—114(1) of the Code (Ill. Rev. Stat. 1975, ch. 26, par. 5—114(1)) makes it clear that the issuer of the credit has no right to refuse to honor a complying draft or demand. The obligation of the credit is without reference to the compliance of the buyer (customer) or the seller (beneficiary) with the underlying

contract. The issuer deals only with documents which must comply with the terms of the credit. Once compliance is determined, the issuer is not concerned with the quality of the goods shipped or the accuracy of the documents if they are regular on their face. It is therefore apparent that the buyer (customer), the one who has procured the issuance of the credit, places substantial reliance upon the integrity or character of the seller (beneficiary). "Any procedure which extends the risk which the buyer incurs by opening the credit—for example, an assignment of the credit by the seller—should not be permitted without adequate safeguards for the buyer." (Ufford, *Transfer and Assignment of Letters of Credit Under the Uniform Commercial Code,* 7 Wayne L. Rev. 263, 264-65 (1960).) Another author states:

> "If the letter of credit is in such form that no one except the person upon whose honesty the buyer is depending can give such performance as the credit requires, the buyer has an excellent chance of receiving what the credit is intended to pay for. If the credit were assignable to such an extent that performance could be delegated to another, the seller-beneficiary might unwittingly assign it to someone who might, because he is placed in a position enabling him to do so, misuse the credit or ship trash instead of merchandise. \*\*\*
>           \*\*\*
> We see here perhaps the best reason there is for the present rule of non-assignability of credits which do not contain express words of assignability. The buyer is willing to be responsible for the acts of a named seller, and he should not be placed in a position such that someone else's acts may cause him loss or trouble." McGowan, *Assignability of Documentary Credits,* 13 Law & Contemp. Prob. 666, 681-82 (1948).

Thus, section 5—116(1) above quoted authorizes the transfer or assignment of credits only when the credit is expressly designated as transferable or assignable. The limitation, however, does not prevent the beneficiary from

assigning the proceeds of the credit, and as section 5—116(2) specifically provides, even though the credit specifically states that it is nontransferable or nonassignable, the beneficiary may, before performance of the conditions of the credit, assign his right to the proceeds. Ill. Rev. Stat. 1975, ch. 26, par. 5—116(2).

We do not view the restrictions on transferability or assignability contained in section 5—116(1) of the Code as preventing the liquidator in our case from drawing against the credit issued to Summit. First, we note that from the pleadings and the documents presented with the draft it appears that Summit has performed by extending the credit to Associated, which the letter of credit was issued to induce. We further note that a deficit balance exists in favor of Summit in excess of the amount specified in the letter of credit. Also, we consider significant the fact that the transfer of the rights of Summit under this credit was not a voluntary transfer or assignment but was accomplished by operation of law. This is not, therefore, an attempted assignment of Summit's obligation to perform, but is only a transfer to the liquidator by order of the court of Summit's right to recover under the credit. The liquidator is not a stranger to the letter of credit, but is, in effect, the representative of Summit and is acting for the benefit of its estate, pursuant to order of court in marshaling the assets of the insurance company. It has generally been held that transfers to bankruptcy or insolvency trustees, or to receivers, resulting from statutory provisions or order of court, are transfers by operation of law and are therefore not within the prohibition of certain anti-assignment statutes. See Annot., 12 A.L.R. 2d 460, 479 (1950); 2 R. Clark, The Law and Practice of Receivers sec. 447 (3d ed. 1959). See also *McIlvaine v. City National Bank & Trust Co.* (1942), 314 Ill. App. 496, 521.

In this case we need not decide the broad question of

whether there can be a complete transfer of all incidents of a letter of credit by operation of law. The nonassignability rule developed as a result of a concern that the transfer or assignment of a credit would place the performance which the credit sought to induce and the right to recover on the credit in a person other than the one in whom the one who procured the issuance of the letter (the customer) placed his trust and confidence. (McGowan, *Assignability of Documentary Credits*, 13 Law. & Contemp. Prob. 666, 682 (1948).) Here, the original beneficiary of the credit had performed according to its terms and only the right of recovery under it has been transfered by operation of law to the liquidator. The beneficiary chosen by the customer has performed and the customer has received the protection which the nonassignability rule was designed to effect.

At the time of the entry of the order by the court in New York transfering Summit's property and right to the liquidator, Summit had a right to demand and receive payment under the credit upon the presentation of certain complying documents. There is no reason why this right should not pass to the liquidator as a claim belonging to the company's estate to be collected by the liquidator for distribution according to law. The New York statute provides that the assets of an insolvent insurance company vest in the liquidator *by operation of law*. (New York Ins. Law art. XVI, sec. 514, par. 2 (McKinney).) A similar provision is found in our statute (Ill. Rev. Stat. 1975, ch. 73, par. 803), which provides for the liquidation of the assets and the distribution of the company's estate. Ill. Rev. Stat. 1975, ch. 73, pars. 803, 805.

We noted above the similarity between the function served by a "stand-by" or "guaranty" letter of credit and an ordinary guaranty undertaking. In *Essex International, Inc. v. Clamage* (7th Cir. 1971), 440 F.2d 547, the court, in applying Illinois law, noted that the Illinois courts have refused to apply mechanically the nonassignability rule as

to guaranties, noting that the factual setting of each case is examined to determine whether the policy underlying the rule is applicable. Because of the narrow scope of the holding in our case, it is not necessary to adopt the broader holding of *Clamage*; however, the part of that holding which we have noted is helpful for the limited purpose of this opinion. In our case, as in *Clamage,* there is no need to mechanically apply the nonassignability rule in a fact situation such as that now before this court where the primary object which the rule seeks to insure, performance by one in whom trust has been placed, has been accomplished and only the right to recover under the letter of credit is passed to the liquidator by operation of law under the provision of the applicable statute and the order of the court.

Pastor also contends that, pursuant to an order of the New York court in the liquidation proceedings, the agency contract between Summit and Associated had been terminated prior to the time the draft was presented for payment under the letter of credit. Pastor contends that the credit was enforceable only so long as the agency contract with Associated remained in full force and effect. We do not agree. Although reference is made in the letter of credit to an agency contract between Summit and Associated, as a basis for calculating the amount to be drawn, payment under the credit is not conditioned on the contract being in full force and effect. A letter of credit is an undertaking independent of any underlying contract. As such, the obligation to pay does not depend upon the underlying contract or its performance unless it is so provided in the letter of credit. The terms and conditions of the letter of credit determine and govern the bank's obligation to pay. The conditions of the letter of credit with which we are concerned are set out above and require only that the draft drawn "must be accompanied by your official statement setting forth the amount of the loss, our

agreement description and amount of deficit, and your calculation *** of the loss or deficit." The documents which are presented by the beneficiary of a credit must comply with those stipulated in its terms. The bank is dealing in documents and not in contract performance. When the documents presented comply with the conditions specified in the letter of credit, the bank is authorized and obligated to pay pursuant to the terms of the credit. Ill. Rev. Stat. 1975, ch. 26, par. 5—114; Ill. Ann. Stat., ch. 26, par. 5—114, Uniform Commercial Code Comment; Joseph, *Letters of Credit: The Developing Concepts and Financing Functions,* 94 Banking L.J. 816, 818 (1977); Ufford, *Transfer and Assignment of Letters of Credit Under the Uniform Commercial Code,* 7 Wayne L. Rev. 263, 265 (1960); Verkuil, *Bank Solvency and Guaranty Letters of Credit,* 25 Stan. L. Rev. 716, 719-20 (1973).

Related to this contention is Pastor's further argument that inasmuch as the liquidator failed to furnish an accounting setting forth the amount of Summit's loss, which made drawing against the letter necessary, the requirements of the letter had not been complied with. There is no requirement contained in the letter of credit that the beneficiary of the letter furnish an account of Summit's loss. As noted above, the letter only required that the draft be accompanied by "your official statement setting forth the amount of the loss." The statement which accompanied the draft set forth the amount of the loss. No accounting was furnished and no accounting was required.

Pastor makes the further argument that since he was not a party to the New York proceedings, permitting the liquidator to draw against the letter of credit would be a denial of Pastor's right to due process. We do not agree. The New York proceedings did not render an *in personam* judgment against Pastor. The proceeding was an *in rem* proceeding. The bare allegation that Pastor was denied due

process because he was not made a party to or "given an opportunity to be heard" in the New York case is not sufficient cause to question an order entered in that proceeding.

We hold that the transfer to the liquidator by operation of law of Summit's right to recover under the letter of credit is not prohibited by section 5—116(1) of the Uniform Commercial Code; that the objections to the complying documents are not well taken; and that Pastor has not shown that he has been deprived of due process of law. We agree with the appellate court that the trial court improperly denied the liquidator's petition for leave to intervene. The liquidator has an interest in the letter of credit that could be adversely affected without adequate representation being afforded, if his petition for leave to intervene were denied. Under section 26.1(1)(b) of the Civil Practice Act (Ill. Rev. Stat. 1975, ch. 110, par. 26.1(1)(b)) the liquidator had a right to intervene.

The judgment of the appellate court is affirmed, and the cause is remanded to the circuit court of Cook County with directions to proceed in accordance with this opinion.

*Affirmed and remanded,*
*with directions.*