## In re VALLEY VUE JOINT VENTURE, Debtor.

### Bankruptcy No. 90–10499–AB.

United States Bankruptcy Court,
E.D. Virginia,
Alexandria Division.

Jan. 29, 1991.

Joseph H. Kasimer, Stephen J. Annino, Kasimer & Ittig, P.C., Falls Church, Va., for S.W. Rodgers Company, Inc.

Ronald L. Walutes, Walutes and Bedford, Annandale, Va., for Valley Vue Joint Venture.

## MEMORANDUM OPINION

MARTIN V.B. BOSTETTER, Jr., Chief Judge.

This matter is before the Court upon the objection by Valley Vue Joint Venture, a Virginia general partnership (the "Debtor"), to a proof of claim filed by S.W. Rodgers Co., Inc., a Virginia corporation ("Rodgers"), in the amount of $1,000,000. Rodgers' claim results from its reimbursement of a bank which honored a standby letter of credit issued for the account of Rodgers. The letter of credit was drawn upon by the Bank of Baltimore, a secured creditor of the Debtor, following the Debtor's pre-petition default on a loan made to the Debtor by the Bank of Baltimore. Rodgers asserts that it is entitled to be subrogated to the rights of the Bank of Baltimore pursuant to 11 U.S.C. § 509(a) and general principles of equity. For the reasons stated herein, this Court denies the Debtor's objection and holds that Rodgers is entitled to be subrogated to the rights of the Bank of Baltimore with respect to the bank's lien on certain property owned by the Debtor.

In February 1989, the Debtor, a real estate development partnership comprised of VSE Capital Corporation and John E. Alvey, III, obtained a short term $4,493,000 loan from Ameribanc Savings Bank to enable the Debtor to acquire land in Northern Virginia on which the Debtor intended to build single family homes. Ameribanc required that its loan be guaranteed and that the guaranty be secured by a $1,000,000 standby letter of credit[1]. The Debtor asked Rodgers, one of its contractors, to furnish the guaranty and letter of credit to Ameribanc. Rodgers agreed to do so and entered into a Guaranty Agreement[2] with the Debtor dated February 10, 1989 (the "Original Agreement"). Paragraph 3 of the Original Agreement states that:

> Rodgers agrees that it *waives subrogation and contribution* with respect to its guaranty *and acknowledges that it will have no recourse* against [the Debtor] or its partners, VSE Capital Corporation and John E. Alvey, III, or any guarantors including David K. Vitalis or John E. Alvey, III or their respective spouses, if any, or any other indorsers or guarantors of the loans issued by the Mortgagees for the Project in the event that a Mortgagee draws upon the Letter of Credit in the event [the Debtor] defaults in its obligations to such mortgagee.

(emphasis added).

Rodgers never delivered a guaranty to Ameribanc but did cause a $1,000,000 standby letter of credit to be issued for the benefit of Ameribanc.

In March 1989, the Debtor refinanced the Ameribanc loan with the Bank of Baltimore which required that its loan be secured by a deed of trust on the property that the Debtor acquired with the proceeds of the Ameribanc loan. The Bank of Baltimore

---

**1.** A standby letter of credit, sometimes referred to herein as a standby credit, is a document pursuant to which the issuer (usually a bank), at the request of its customer (frequently referred to as the account party), agrees to pay the named beneficiary up to a designated amount generally upon the beneficiary's demand for payment and a certification as to the nonperformance of some obligation owed to the beneficiary. *See* B. Wunnicki, *Standby Letters of Credit* § 2.1 at 10 (1989). Once the issuer honors the beneficiary's demand for payment, the account party has an immediate obligation to reimburse the issuer. *See* U.C.C. § 5–114(3) (1987) [Va.Code Ann. § 8.5–114(3) (1965)]. A standby credit can enhance the borrowing capability of a borrower by substituting in whole or part the known and secure credit of the issuer for the higher risk credit of such borrower. *See Insurance Co. of North America v. Heritage Bank, N.A.,* 595 F.2d 171, 173 (3d Cir.1979).

**2.** The heading "Guaranty Agreement" is a misnomer. The document is an agreement to furnish a guaranty.

required that its loan be guaranteed by VSE Capital Corporation, John E. Alvey, III, David K. Vitalis (the majority shareholder of VSE Capital Corporation) and Vitalis' wife (collectively, the "Guarantors"). The Bank of Baltimore also required the delivery of an additional guaranty to be secured by a $1,000,000 standby letter of credit. Rodgers agreed to furnish such guaranty and letter of credit. In addition, Rodgers, at the request of the Debtor, agreed to lend the Debtor $500,000 to enable the Debtor to satisfy all of the conditions to closing the Bank of Baltimore loan. The $500,000 loan was guaranteed by John E. Alvey, III, David K. Vitalis and Vitalis' wife. To evidence their agreement, Rodgers and the Debtor entered into an Amendment to Guaranty dated March 31, 1989 (the "Amendment"). Paragraph 3 of the Amendment states that "Paragraph 3 of the Guaranty Agreement is *replaced* by the following language: ..." (emphasis added)[3]. The language that followed did not contain the language in Paragraph 3 of the Original Agreement regarding waiver of subrogation and recourse. The Amendment was executed only by the Debtor and Rodgers. No formal consents to the execution of the Amendment were obtained from the Guarantors.

The Bank of Baltimore never received a guaranty from Rodgers but did receive an irrevocable standby letter of credit in the amount of $1,000,000 (the "Letter of Credit") issued by Security Bank Corporation and confirmed by Sovran Bank, N.A. (the "Confirming Bank")[4] for the account of Rodgers. The Letter of Credit provided that it could be drawn by a written instrument stating that "[a] default or Event of Default has occurred as defined under the terms of a certain deed of trust from Valley Vue Joint Venture, as grantor, in favor of The Bank of Baltimore as beneficiary...."

The loan agreement between the Debtor and the Bank of Baltimore provided that "[i]n the event the [Bank of Baltimore] draws down the [L]etter of [C]redit, such proceeds will be applied to the outstanding principal balance under the Note" evidencing the Bank of Baltimore's loan to the Debtor.

On February 13, 1990, following a default by the Debtor on its loan from the Bank of Baltimore, the Bank of Baltimore drew the full amount of the Letter of Credit. Pursuant to its obligations to the Confirming Bank, Rodgers promptly reimbursed the Confirming Bank for the $1,000,000 that the Confirming Bank had paid to the Bank of Baltimore. On March 9, 1990, the Debtor filed its voluntary petition under Chapter 11 of the Bankruptcy

---

**3.** The Debtor contends that, notwithstanding the use of the word "replace" in Paragraph 3 of the Amendment, the parties intended that Paragraph 3 would merely modify the terms of Paragraph 3 of the Original Guaranty and that Paragraph 3 of the Original Guaranty remains intact. The unambiguous use of the word "replace" does not countenance consideration of the Debtor's contention. *See Dana Corp. v. United States,* 470 F.2d 1032, 1043, 200 Ct.Cl. 200 (1972) ("Where a contract is amenable to only one reasonable construction, it should be enforced according to its tenor as a whole."); *Hotpoint Inc. v. United States,* 117 F.Supp. 572, 574, 127 Ct.Cl. 402 (1954) ("[T]he court should, where the language of the contract is unambiguous, ascertain and effectuate the intention of the parties as expressed by the language in the contract. In so doing the court should give the terms their usual and ordinary meaning even though the intention of one of the parties may have been different from that expressed.") (citations omitted); *Allen v. Globe–Democrat Publishing Co.,*

368 S.W.2d 460, 466 (Mo.1963) ("Our objective in construing the terms of the agreement is not to determine what the parties intended to say, but what they intended by what they did say.") (citations omitted); *Conner v. Hendrix,* 194 Va. 17, 22, 72 S.E.2d 259, 265 (1952) ("It is not permissible to interpret that which has no need of interpretation.").

**4.** A confirming bank is "a bank which engages either that it will itself honor a credit already issued by another bank or that such a credit will be honored by the issuer or a third bank." U.C.C. § 5–103(1)(f) (1987) [Va.Code Ann. § 8.5–103(1)(f) (1965) ]. The purpose of having a letter of credit confirmed is to add the credit standing of the confirming bank to that of the issuer. B. Wunnicki, *Standby Letters of Credit* § 3.5 at 45 (1989). The confirming bank is directly obligated on the credit as though it were the letter's issuer. *Venizelos, S.A. v. Chase Manhattan Bank,* 425 F.2d 461, 465 (2d Cir. 1970).

Code [5]. Thereafter, Rodgers filed its proof of claim asserting that it is entitled to be subrogated to the rights of the Bank of Baltimore because it caused the Debtor's loan to be reduced by $1,000,000 pursuant to the Letter of Credit.

■ In objecting to Rodgers' proof of claim, the Debtor first contends that Rodgers, as the account party who arranged for the issuance of the Letter of Credit, is not entitled under either 11 U.S.C. § 509(a) [6] or general principles of equity to be subrogated to the rights of the Bank of Baltimore. The Debtor argues that the Confirming Bank's obligation to pay the Bank of Baltimore pursuant to the Letter of Credit was a primary obligation and not in the nature of a guaranty or suretyship agreement. Therefore, according to the Debtor, the Confirming Bank was not "liable with the debtor on, ... a claim of a creditor against the debtor" and Rodgers could not acquire any rights greater than those that the Confirming Bank possessed. The Debtor relies principally on *Bank of America Nat'l Trust & Sav. Assoc. v. Kaiser Steel Corp. (In re Kaiser Steel Corp.)*, 89 B.R. 150 (Bankr.D.Colo.1988), which held that an issuer who pays a standby letter of credit is not entitled under 11 U.S.C. § 509(a) to be subrogated to the rights of the beneficiary.

The *Kaiser* court stated that because subrogation is an equitable principle, an entity seeking to be subrogated to the rights of a creditor under 11 U.S.C. § 509(a) must satisfy a five-part test derived from general equitable principles of subrogation. *Kaiser*, 89 B.R. at 152. The opinion of the court indicated that one element of such test is that any payment made by such entity to such creditor must have satisfied a debt for which the entity was "not primarily liable." *Id.* The court held that the issuer of a standby letter of credit "assumes an independent obligation to pay the creditor upon presentation of demand. When the issuer pays its own debt it cannot then step into the shoes of the creditor to seek subrogation, reimbursement or contribution from the debtor." *Kaiser*, 89 B.R. at 153.[7]

In *Kaiser*, the debtor obtained a standby letter of credit from a bank for the benefit of a leasing company that extended credit to the debtor through a sale/leaseback transaction. The debtor's obligations to the leasing company under their lease agreement were secured by a lien on all of the debtor's assets. After the debtor defaulted on its obligations to the leasing company, the leasing company drew against its letter of credit. The debtor failed to reimburse the issuer after the issuer honored the letter of credit. The issuer claimed that it was entitled, after the leasing company's claim was paid in full, to be subrogated to the leasing company's security interest in the debtor's assets.

**5.** On December 5, 1990, the Court entered an order converting this case from Chapter 11 to Chapter 7.

**6.** 11 U.S.C. § 509(a) provides that "... an entity that is liable with the debtor on, or that has secured, a claim of a creditor against the debtor, and that pays such claim, is subrogated to the rights of such creditor to the extent of such payment."

**7.** *Kaiser's* rigid five-part test apparently is derived from a 1954 California case that consolidated various principles relating to subrogation discussed in American Jurisprudence. *See In re Kaiser Steel Corp.*, 89 B.R. 150, 152, citing *In re Flick*, 75 B.R. 204, 206 (Bankr.S.D.Cal.1987), citing *Simon v. United States*, 756 F.2d 696, 699 (9th Cir.1985), citing *Caito v. United California Bank*, 20 Cal.3d 694, 704, 576 P.2d 466, 471, 144 Cal.Rptr. 751, 756 (1978), citing *Grant v. de Otte*, 122 Cal.App.2d 724, 728, 265 P.2d 952, 955 (1954), citing 50 Am.Jur. *Subrogation* §§ 10 and 97. The *Kaiser* test requires that (1) the codebtor must have made payment to protect its own interests, (2) the codebtor must not have been a volunteer, (3) the payment must have satisfied a debt for which the codebtor was not primarily liable, (4) the entire debt must have been paid, and (5) subrogation must not cause injustice to the rights of others. *Kaiser*, 89 B.R. at 152. However, subrogation is an equitable principle to be applied not in a mechanical fashion but rather as necessary to accomplish equitable results. *See Federal Land Bank v. Joynes*, 179 Va. 394, 402, 18 S.E.2d 917, 920 (1942) ("[N]o general rule can be laid down which will afford a test in all cases for [the] application [of equitable subrogation].") (citation omitted). Because our holding does not depend upon using a different test but rather upon applying a different interpretation to part three of the test, we do not need to take exception to the five elements *Kaiser* uses in its analysis.

The court found that the payment under the letter of credit satisfied a debt for which the issuer was primarily liable and therefore rejected the issuer's claim. *Kaiser,* 89 B.R. at 152.

The *Kaiser* court correctly observed that an issuer's obligation to honor a standby letter of credit is considered a "primary" obligation. *See, e.g., Republic Nat'l Bank v. Northwest Nat'l Bank,* 578 S.W.2d 109, 114 (Tex.1978) ("[The issuer] assumes a primary obligation independent of the underlying contract and engages that it will pay upon the presentation of documents required by the instrument."). However, the *Kaiser* court failed to distinguish between the primary liability of a debtor to its creditor to repay a loan and the primary obligation of the issuer to its beneficiary to honor a letter of credit. When a standby credit supporting a loan is honored, the issuer[8] admittedly is satisfying its obligation as a primary obligor to honor the standby credit, but at the same time it is in fact satisfying a debt for which a person other than the issuer is primary liable. This distinction, although not recognized by the Debtor or the *Kaiser* court, is critical.[9] An issuer is not primarily liable on the debt supported by its standby credit.

■ We reject the *Kaiser* analysis and hold that where a standby letter of credit is used to support a loan from the beneficiary to the debtor, a confirming bank, by honoring the credit and thereby reducing the debtor's obligation to the beneficiary, is "an entity that is liable with the debtor on, ... a claim of a creditor against the debtor" under 11 U.S.C. § 509(a)[10] and has satisfied a debt for which it is not primarily liable under general equitable principles of subrogation. We hold further that a non-debtor account party who reimburses such confirming bank is entitled under general equitable principles to be subrogated to the rights of such confirming bank.

As between the Debtor and the Confirming Bank here, the primary liability for repayment of the Debtor's loan rests with the Debtor. The Confirming Bank's liability was primary only with respect to its duty to the Bank of Baltimore to honor the Letter of Credit. The intent of the parties, as evidenced by the loan agreement between the Debtor and the Bank of Baltimore, was that the Confirming Bank would, by honoring the Letter of Credit, reduce a debt for which the Debtor, not the Confirming Bank, was primarily liable.

■ The Debtor seeks to have this Court rule, as did the *Kaiser* court, that because of the use of the phrase "primary obligation" in the letter of credit context, an issuer is disqualified from being awarded subrogation rights under both equitable principles of subrogation and 11 U.S.C. § 509(a). However, the Debtor confuses

---

8. Because a confirming bank is obligated on the letter of credit to the same extent as the issuer, *see* U.C.C. § 5–107(2) (1987) [Va.Code Ann. § 8.5–107(2) (1965)], we use the term "issuer" throughout this opinion to include confirming banks, unless otherwise specified.

9. When one considers the novel status the framers of Article 5 of the U.C.C. gave letters of credit, it is easy to understand why confusion exists regarding the availability of subrogation to issuers and nondebtor account parties. The intention of the framers of Article 5 was to give letters of credit a special status: "[I]t was one of the prime purposes of the drafters of Article Five to 'set an independent theoretical framework' for this device, a framework independent of contract, of guaranty, of third party beneficiary law, of the law of assignment, and of negotiable instruments." J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code* § 19–2 at 812 (3d ed. 1988) [hereinafter "White & Summers"].

10. The Debtor also contends that Rodgers is not "an entity that ... has secured ... a claim of a creditor against the debtor" and that therefore it is not entitled to subrogation under that language contained in 11 U.S.C. § 509(a). We agree. Even though in general discourse it is commonly said that a standby credit "secures" a loan, such term, as used in Section 509(a), refers to the granting of a security interest in an asset. *See Beach v. First Union Nat'l Bank of North Carolina (In re Carley Capital Group),* 119 B.R. 646, 648 (W.D.Wisc.1990); 3 *Collier on Bankruptcy,* ¶ 509.02 at 509–4 (15th ed. 1988) ("[T]he subrogation provision of Section 509(a) applies when an entity has secured a creditor of the debtor by using his own property as collateral without incurring any personal obligation."). In the case at bar, neither the Confirming Bank nor Rodgers granted a security interest to the Bank of Baltimore.

the notion that an issuer of a standby credit has a "primary obligation" to honor its letter of credit with the concept that an entity seeking subrogation must have satisfied a debt for which the entity was "not primarily liable."[11] The latter principle appears to be founded upon the notion that a debtor, after paying a debt for which it is primarily liable, may not step into the shoes of his creditor and seek recourse against those who are secondarily liable, such as guarantors, or seek the benefit of collateral pledged by others to secure his debt. This principle has been codified in 11 U.S.C. § 509(b)(2) which provides that an entity may not be subrogated to the rights of a creditor if, "as between the debtor and such entity, such entity received the consideration for the claim held by such creditor." We believe that Section 509(b)(2) correctly captures the purpose of the "primary liability" limitation under general equitable principles discussed in *Kaiser*. *See* 124 Cong.Rec. H11,095 (daily ed. Sept. 28, 1978) and 124 Cong.Rec. 17,411–12 (daily ed. Oct. 6, 1978), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 6452 and 6521 ("Section 509(b)(2) reiterates the well-known rule that prevents a debtor that is ultimately liable on the debt from recovering from a surety or a co-debtor."). We believe that the requirement in equity as well as under 11 U.S.C. § 509(b)(2) that a party seeking

subrogation must not be "primarily liable" is designed to prevent a person who received the consideration (*e.g.*, the loan proceeds) from the creditor from being subrogated to the creditor's rights against a guarantor, surety, accommodation comaker or similar party after the debtor has satisfied his own obligations.[12]

In the letter of credit context, the statement that the issuer's obligation to honor a letter of credit is primary goes to the issue of whether the issuer can *avoid* its obligation by relying on underlying transaction defenses. The "primary obligation" language stems from the "independence principle" underlying letters of credit. It has been said that "[w]hen the bank issues an irrevocable letter of credit, it assumes an obligation to honor drafts which comply with that credit.... That obligation is fully independent of any underlying agreement." *Printing Dep't, Inc. v. Xerox Corp.*, 20 B.R. 677, 681 (Bankr.E.D.Va. 1981). The independence principle is "the cornerstone of the commercial vitality of letters of credit." *Ward Petroleum Corp. v. F.D.I.C.*, 903 F.2d 1297, 1299 (10th Cir. 1990). In *Ward Petroleum* the court stated that "[t]he independence of the letter of credit from the underlying commercial transaction facilitates payment under the credit upon a mere facial examination of documents; it thus makes the letter of

---

11. *See* Kozolchyk, *The Emerging Law of Standby Letter of Credit and Bank Guarantees*, 24 Ariz.L.Rev. 319, 321 n. 9 (1982) ("Much confusion has emerged from resorting to the primary-secondary dichotomy in order to differentiate the commercial letter of credit from the standby credit and, in turn, the standby from the guaranty credit.... In part the confusion is due to a failure to express what is meant by the terms primary or secondary, susceptible as they are to various legal connotations. A liability can be classed as primary as a result of its place in a sequence of claims (i.e., what debtor must be contacted or sued first?) and also as a result of the debtor's inability to rely on underlying transaction defenses...."); Jarvis, *Standby Letters of Credit–Issuers, Subrogation and Assignment Rights–Part I*, 9 U.C.C. L.J. 356, 366 n. 50 (1977) ("As between the issuer and customer ... there is no doubt but that ultimate liability for payment to the beneficiary ... rests with the customer.... In this sense, an issuer ... is only secondarily liable."); Arnold & Bransilyer, *Standby Letters of Credit—The Controversy Con-*

*tinues*, 10 U.C.C. L.J. 272, 279–80 (1978) ("[T]he issuer is primarily liable with respect to its obligations under the letter of credit (which obligations, needless to say, are different from those of the applicant under the underlying agreement)."); Verkuil, *Bank Solvency and Guaranty Letters of Credit*, 25 Stan.L.Rev. 716, 725 (1973) ("The bank is, in essence, secondarily liable, a conceptual distinction that separates the guaranty letter of credit from traditional letters of credit and might justify the application of different rules of law.").

12. The Debtor not only ignores the purpose behind the third element of *Kaiser's* five-part test, as embodied in 11 U.S.C. § 509(b)(2), but also the actual language of such element: "the payment [by the party seeking subrogation] must have satisfied a debt for which [such party] was not primarily liable." *Kaiser*, 89 B.R. at 152. The payment by the Confirming Bank here to the Bank of Baltimore certainly did satisfy a debt for which the Confirming Bank was not primarily liable (*i.e.*, the Debtor's).

credit a unique commercial device which assures prompt payment." *Ward Petroleum,* 903 F.2d at 1299; *see also In re Compton Corp.,* 831 F.2d 586, 590 (5th Cir.1987) ("Under the independence principle, an issuer's obligation to the letter of credit's beneficiary is independent from any obligation between the beneficiary and the issuer's customer.... Any disputes between the beneficiary and the customer do not affect the issuer's obligation to the beneficiary to pay under the letter of credit."); *Voest–Alpine Int'l Corp. v. Chase Manhattan Bank,* 707 F.2d 680, 682 (2d Cir.1983) ("[Attempts] to avoid payment premised on extrinsic considerations—contrary to the instruments' formal documentary nature—tend to compromise their chief virtue of predictable reliability as a payment mechanism."). According to *In re Originala Petroleum Corp.,* 39 B.R. 1003, 1008 (Bankr.N.D.Tex.1984), "[l]etter of credit financing will cease to be a viable component of finance world-wide unless the independence principle [is] preserved." *See also East Girard Sav. Ass'n v. Citizens Nat'l Bank and Trust Co.,* 593 F.2d 598, 602 (5th Cir.1979) ("This entitlement is independent of collateral obligations which may exist under the other underlying contracts.... Thus, even if the producer of the letter has a valid defense on his contract with the recipient of the letter, the bank cannot assert it."); *Pringle–Associated Mortgage Corp. v. Southern Nat'l Bank,* 571 F.2d 871, 874 (5th Cir.1978) ("The key to the uniqueness of a letter of credit and to its commercial vitality is that the promise by the issuer is independent of any underlying contracts.").

In contrast to the rights of an issuer of a letter of credit, it is generally held that a guarantor may assert various defenses to his payment obligation under his guaranty and avoid such obligation entirely. *See, e.g., Bank of New Jersey v. Pulini,* 194 N.J.Super. 163, 476 A.2d 797, 799 (A.D. 1984). For example, the extension of the due date of the debtor's loan or the impairment of the guarantor's recourse against the debtor or any collateral, without the guarantor's consent, or the illegality, invalidity or unenforceability of the debtor's

obligations, will constitute valid defenses to the guarantor's obligation. *See* 10 Williston, *Law of Contracts* 714–786 (3d ed. 1967). By making it clear that issuers of letters of credit have an independent primary obligation to honor their letters of credit, Article 5 of the U.C.C. makes such defenses unavailable to issuers, thereby promoting the certainty feature of letters of credit. *See* White & Summers, *supra* note 8, § 19–2 at 814 ("Thus, the guarantor can often set up defenses that the principal debtor has against the creditor. An issuer of a letter of credit cannot do so. In that sense the issuer's obligation to the beneficiary (the creditor) is said to be primary, i.e., not subject to the defenses the debtor might have against the creditor."); *see also In re Carley Capital Group,* 119 B.R. 646, 649 (holding that because of the independence principle, nondebtor account parties may not avoid their obligations in a letter of credit transaction because substantial changes were agreed to by the beneficiary in the underlying loan documents without the consent of the account parties).

■ It would appear, therefore, that the notion that an issuer's obligation to honor the letter of credit is a "primary obligation" should be interpreted to mean that, under the independence principle, the issuer may not avoid its obligation to honor the credit by identifying deficiencies in underlying contracts or by otherwise asserting defenses that are typically available to parties who are generally considered to be "secondarily liable" such as guarantors and sureties. Thus, we believe that the "primary obligation" language in the letter of credit context concerns itself with the issuer's ability to avoid honoring its letter of credit, whereas the "primary liability" language in the subrogation context concerns itself with whether the entity, after reducing a claim of a creditor, received the consideration from the creditor.

Some of the confusion surrounding the application of subrogation in the standby letter of credit context may stem from the nature of letters of credit. The traditional letter of credit, also referred to as a commercial letter of credit, was developed as a

means of facilitating international transactions involving sales of merchandise between distant buyers and sellers not commercially acquainted with each other. *See First Empire Bank v. F.D.I.C.*, 572 F.2d 1361, 1366 (9th Cir.1978). Typically, a seller of goods entering into a sales agreement with an unfamiliar buyer requires the buyer to deliver a commercial letter of credit issued by a creditworthy bank with whom the seller is familiar. Under the terms of the commercial credit, the bank agrees to honor the seller's draft following the seller's presentation of bills of lading, air freight receipts or other evidence of title to the goods. Following the honoring of the letter of credit, the buyer reimburses the issuer for the amount drawn. *See* White & Summers, *supra* note 8, § 19–1 at 807–809.

Standby letters of credit, on the other hand, evidence the obligation of the issuer to pay not in the ordinary course of business but in the event that a party defaults, and thereby accomplish results analogous to that of guaranties. *See Insurance Co. of North America v. Heritage Bank*, 595 F.2d 171, 173 (3d Cir.1979) ("In contrast to its traditional function, the letter of credit in its newer variations frequently serves as a guaranty, and the issuer anticipates that it will not be called upon to honor the credit."); *First Empire Bank*, 572 F.2d at 1367 ("[T]he standby letter of credit possesses more of the characteristics of a guarantee...."); *Bank of N.C. v. Rock Island Bank*, 570 F.2d 202, 206 n. 7 (7th Cir.1978) ("Indeed, the essential distinction between the letter of credit and the contract of guaranty is purely formal, not functional. Like the contract of guaranty, the letter of credit may be so designed as to secure the performance of another contractual obligation. Not surprisingly, such credits are called 'guaranty' letters of credit."); *Pastor v. Nat'l Republic Bank*, 76 Ill.2d 139, 147, 28 Ill.Dec. 535, 538, 390 N.E.2d 894, 897 (1979) ("Unlike the sales or

traditional letter of credit, which obligates the issuer to pay in the ordinary course of a business transaction, the guaranty or standby letter of credit obligates the issuer to pay in the event of a default by one who procured its issuance."); *O'Grady v. First Union Nat'l Bank*, 296 N.C. 212, 231, 250 S.E.2d 587, 599 (1978) ("The term [guaranty letter of credit] is used to describe a transaction in which a letter of credit is used to accomplish the ends of a contract of guaranty or suretyship. In such transactions the letter functions to secure performance of an obligation. This differs from a more traditional use of a letter of credit in transactions for the sale of goods, ...").

Although both commercial and standby letters of credit are conditioned on the happening of some event, the difference lies in who is performing or failing to perform such event. The commercial letter of credit is conditioned on the beneficiary's performance while the standby letter of credit is conditioned on a party's failure to perform its obligations. *See* B. Wunnicke, *Standby Letters of Credit* § 2.8 at 23 (1989).

Despite ample dicta that a standby letter of credit is akin to a guaranty, virtually every court that has considered the device has emphasized that it is not a guaranty. In *Airline Reporting v. First Nat'l Bank*, 832 F.2d 823, 827 (4th Cir.1987), the court stated that

[a]lthough the letter of credit is issued to guarantee the customer's obligation under an underlying contract between the customer and beneficiary, the letter of credit is a distinct transaction between the issuer and beneficiary, and the issuer's obligation under the letter of credit is independent of the underlying transaction....

Although a standby letter of credit issued to support a loan is not a guaranty,[13]

---

**13.** Official Comments to three sections under Article 5 of the U.C.C. also support the principle that a letter of credit is not a guaranty. *See* U.C.C. § 5–101, Official Comment (1987) [Va. Code Ann. § 8.5–101, Official Comment (1965) ] ("The other source of law respecting letters of

credit is the law of contracts with occasional unfortunate excursions into the law of guaranty."); U.C.C. § 5–103, Official Comment 3 (1987) [Va.Code Ann. § 8.5–103, Official Comment 3 (1965) ] ("The issuer is not a guarantor...."); U.C.C. § 5–117, Official Comment (1987) [Va.

it accomplishes results analogous to that of a guaranty by ultimately reducing a debt for which another is liable. But the recognition that standby letters of credit are not guaranties does not preclude the application of subrogation principles to an issuer and nondebtor account party of a standby credit issued to support a loan. Neither equity nor 11 U.S.C. § 509(a) requires a party seeking subrogation to be a surety or guarantor.

Recognizing that issuers and nondebtor account parties of standby letters of credit have rights to subrogation does not impair the "independence principle" or any of the other features of letters of credit. Indeed, such recognition may indirectly promote the use of standby credits to support secured debt by protecting the issuers of such credits, especially where debtors have insufficient unencumbered assets to independently secure such credits. In addition, no rights of the beneficiary will be impaired by recognizing an issuer's or nondebtor account party's right to subrogation. Under principles of both equitable subrogation and 11 U.S.C. § 509(c), the right to subrogation is subordinate to the rights of the beneficiary until the entire amount of the beneficiary's claim has been satisfied. *See* 11 U.S.C. § 509(c); *see also Martin v. State Farm Mut. Auto. Ins. Co.,* 375 F.2d 720, 722 n. 2 (4th Cir.1967) ("[T]he insured party's insurer had no right of subrogation against the tortfeasor until the injured party received full satisfaction of his judgment."); *Obici v. Furcron,* 160 Va.

351, 362, 168 S.E. 340, 344 (1933) ("The right of subrogation cannot be enforced until the whole debt is paid, ...") (citations omitted); *Combs v. Agee,* 148 Va. 471, 475, 139 S.E. 265, 266 (1927) ("There can be no subrogation to the rights of another unless the claim of that other is fully satisfied; and until the whole debt is paid, ...") (citations omitted).[14]

A recent case applying the *Kaiser* analysis observed that there are no strong equitable reasons to recognize an issuer's right to subrogation to a secured beneficiary's rights. *See In re Carley Capital Group,* 119 B.R. at 649. We disagree. After reviewing the goals of subrogation, we believe that the equities strongly favor allowing an issuer and a nondebtor account party of a standby letter of credit the right to stand in the shoes of a secured beneficiary.

The purpose of subrogation is to prevent the unearned enrichment of one party at the expense of another. *Compania Anonima Venezolana de Navegacion v. A.J. Perez Export Co.,* 303 F.2d 692, 697 (5th Cir.1962), *cert. den.* 371 U.S. 942, 83 S.Ct. 321, 9 L.Ed.2d 276 (1962). The rationale of subrogation is "bottomed on a sensitivity to the comparative equities involved. Where one is more fundamentally liable for a debt which another is obligated to pay, such person shall not enrich himself by escaping his obligation." *Federal Land Bank v. Joynes,* 179 Va. 394, 402, 18 S.E.2d 917, 920 (1942)[15]. Subrogation "is a device

Code Ann. § 8.5–117, Official Comment (1965) ] ("A bank which issues a letter of credit acts as a principal, not as agent for its customer, and engages its own credit."); *see also Printing Dep't., Inc. v. Xerox Corp.,* 20 B.R. 677, 680 (Bankr.E.D.Va.1981) ("[A] letter of credit is distinguishable from a contract of guaranty because under a contract of guaranty the issuer merely secures the debt of another while an issuer of a letter of credit assumes an original, primary obligation.").

**14.** *See also* Jarvis, *Standby Letters of Credit–Issuers, Subrogation and Assignment Rights–Part II,* 10 U.C.C. L.J. 38, 46 (1978) ("A situation may arise, however, in which the issuer, after paying the beneficiary, seeks to realize upon the security held by the beneficiary because the customer has entered bankruptcy. In such cases, there is

no possibility that assertion of subrogative or assigned rights would interfere with the commercial purposes of the standby letter. Not only would the beneficiary have been paid, but the rights claimed by the issuer would be asserted against fourth-party creditors of the customer—not even participants in the letter of credit transaction.").

**15.** To the extent that the interpretation of equitable principles of subrogation is necessary or appropriate in the case at bar, we look primarily to the laws of Virginia for guidance. Conflict of laws rules to be applied by federal courts must conform to those prevailing in the state courts of the forum. *Klaxon v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In Virginia, matters of remedies are governed by the law of the forum. *Willard*

adopted or invented by equity to compel the ultimate discharge of a debt or obligation by him who in good conscience ought to pay it." *Moritz v. Redd*, 151 Va. 644, 652, 145 S.E. 245 (1928) (citations omitted). It is grounded on the notion that "one who has been compelled to pay a debt which ought to have been paid by another is entitled to exercise all the remedies which the creditor possessed against that other." *American Surety Co. v. Bethlehem Nat'l Bank*, 314 U.S. 314, 317, 62 S.Ct. 226, 228, 86 L.Ed. 241 (1941) (citations omitted).

█ The doctrine of subrogation was first applied only in favor of sureties, but through a process of liberalization its application has been enlarged. *Federal Land Bank v. Joynes*, 179 Va. 394, 402, 18 S.E.2d 917, 920 (1942). It is now "broad enough to cover all cases in which one person pays an obligation which in justice and good conscience should have been paid by another." *Morgan v. Gollehon*, 153 Va. 246, 249, 149 S.E. 485, 486 (1929); *see also Compania Anonima*, 303 F.2d at 697 ("[Subrogation] is now a mechanism so universally applied in new and unknown circumstances that it is easy to overlook that it originates in equity.... [I]t is broad enough to include every instance in which one person, not acting as a mere volunteer or intruder, pays a debt for which another is primarily liable, and which in equity and good conscience should have been discharged by the latter") (citations omitted); *Equity Mtg. Corp. v. Loftus*, 323 F.Supp. 144, 156 (E.D.Va.1970) ("Virginia is committed to a liberal application of the principle.") *rev'd* on other grounds, 504 F.2d 1071 (4th Cir.1974). "The doctrine is applicable wherever the *substance* of the relation of principal and surety exists without regard to the mere form." *Rosenbaum v. Goodman*, 78 Va. 121, 126 (1883) (emphasis in original). It is not essential that the party invoking the remedy [of subrogation] should technically occupy the position or

relation of surety for the debt. *Colbert v. Priester*, 214 Va. 606, 608, 203 S.E.2d 134, 135 (1974) (citations omitted).

In the standby letter of credit context, subrogation requires that we focus on the comparative equities of two parties: the issuer and the debtor whose loan is supported by the standby credit. When the standby credit is drawn, the proceeds are applied to reduce the debt owed by a debtor to the beneficiary. Subrogation works to prevent a debtor from retaining the benefit of the reduction of his obligations at the expense of the issuer following the issuer's honoring of the standby credit. The debt supported by a standby credit is one, in the words of *Compania Anonima*, 303 F.2d at 697, "which in equity and good conscience should have been discharged by [another]." An issuer of a standby credit, in contrast to an issuer of a commercial credit, anticipates that the debtor will pay its own obligations and that the issuer will not be called upon to honor the credit. *See Consolidated Aluminum Corp. v. Bank of Virginia*, 544 F.Supp. 386, 399 (D.Md.1982) ("Rather, the bank issuing a standby letter of credit expects to pay only if its customer defaults on the underlying obligation."). In the words of *Federal Land Bank v. Joynes*, 179 Va. at 402, 18 S.E.2d at 920, the debtor is "more fundamentally liable" than is the issuer for the repayment of the debtor's loan.

*Kaiser* is not the only case that has denied rights of subrogation to an issuer or nondebtor account party. In *Carley Capital*, the court held that a nondebtor account party of a standby credit that supports a loan is not entitled to be subrogated to the rights of the secured beneficiary. *Carley Capital*, 119 B.R. at 649. In *Carley Capital*, the debtor received from a creditor a $6,800,000 loan that was secured by real estate and supported by a $1,000,000 standby letter of credit. After the debtor defaulted, the creditor drew the full amount

*v. Aetna Casualty and Surety Co.*, 213 Va. 481, 193 S.E.2d 776 (1973). Although the Letter of Credit provided that it "is subject to the Maryland Uniform Commercial Code," the focus in this matter is not on the contents of the Letter

of Credit but rather on the remedy of subrogation arising out of the honoring of the Letter of Credit. Because equitable subrogation is remedial in nature, the laws of Virginia and not of Maryland apply.

of the standby credit and the nondebtor account parties sought to be subrogated to the rights of the creditor against the debtor. The account parties also contended that they assumed the legal position of guarantors and that substantial changes in the underlying loan documents without the account parties' consent relieved them of their obligations under the standby credit. The court rejected both theories.[16] *Carley Capital*, 119 B.R. at 649.

Like the *Kaiser* court, the *Carley Capital* court observed that an issuer of a standby credit has a primary obligation to honor its credit and held that a nondebtor account party may not step into the shoes of the beneficiary. The court determined that the requirement identified in *Kaiser* that the person seeking subrogation must establish that it was not primarily liable "implicitly includes the requirement that liability be secondary." *Id.* The *Carley Capital* court, however, avoided an analysis of the more difficult issue of defining the term "secondary liability." If we assume that the court meant by such term that the entity seeking subrogation must have possessed the right to assert defenses based on an underlying contract, that would be a novel but nonsensical requirement in the subrogation context in that subrogation concerns itself with an entity that has paid the debt of another, not with an entity that is attempting to avoid its obligations by asserting defenses. If the court meant that the entity must be one from whom the creditor could demand payment only after first demanding payment from another party, that interpretation is contrary to established authority. An accomodation co-maker, for example, is obligated to pay a note holder even if the holder did not first seek recourse against the accomodated co-maker, and is, in that sense, primarily liable. Yet an accomodation co-maker is entitled to subrogation under general equitable principles as well as under 11 U.S.C. § 509(a). *See Adams v. Parker (In re Parker)*, 10 B.R. 562, 565 (Bankr.M.D.

Ala.1981); *Anna Nat'l Bank v. Wingate*, 63 Ill.App.3d 676, 678, 21 Ill.Dec. 84, 86, 381 N.E.2d 19, 21 (1978); *Bank of New Jersey v. Pulini*, 194 N.J.Super. 163, 476 A.2d 797, 799 (A.D.1984). Finally, if *Carley Capital* meant that the entity seeking subrogation must not have received the consideration from the creditor (*e.g.*, the loan proceeds) whose shoes the entity seeks to step into, we agree. However, if that is the proper interpretation, the holding should have been in favor of the nondebtor account parties who did not receive the consideration from the creditor.

Decided before the *Kaiser* case, *Merchants Bank & Trust Co. v. Economic Enterprises, Inc. (In re Economic Enterprises, Inc.)*, 44 B.R. 230 (Bankr.D.Conn. 1984), also held that an issuer of a standby credit is not entitled to the equitable right of subrogation. *Economic Enterprises* involved a standby credit issued for the account of a debtor that supported the debtor's construction loan. The issuer sought to be subrogated to the rights of the secured beneficiary following the default by the debtor on its loan from the beneficiary. In reaching its decision, the court observed that "an issuer of a letter of credit may not look to the underlying contract between its customer and the beneficiary of the letter of credit in connection with its duty to honor the letter of credit." *Economic Enterprises*, 44 B.R. at 231. Although this is a valid rule and serves as the basis for the independence principle underlying letters of credit, it is inapplicable to the issue of whether an issuer is entitled to subrogation. According to the *Economic Enterprises* court, to allow an issuer the right to subrogation "would violate the spirit and intent of the law developing under Article 5 which, as noted, prohibits an issuer from interfering with the underlying contract...." *Economic Enterprises*, 44 B.R. at 232. However, as noted previously, the purpose in denying an issuer the right to interfere with the underlying contract is to prevent the issuer from avoiding its obli-

**16.** Although, for the reasons stated herein, we disagree with *Carley Capital's* conclusion that a nondebtor account party is not entitled to the right to subrogation, we agree with its holding that a nondebtor account party does not assume the role of a guarantor thereby giving rise to defenses based on the underlying contract.

gation to honor the letter of credit. In the subrogation context and the case at bar, the issuer who seeks subrogation has already honored its standby credit and is not attempting to avoid its obligation by "interfering" with the underlying contract. *See also Berliner Handels–Und Frankfurter Bank v. East Texas Steel Facilities, Inc. (In re East Texas Steel Facilities, Inc.),* 117 B.R. 235 (Bankr.N.D.Tex.1990) (following, in part, the *Economic Enterprises* rationale and holding that an issuer of a standby credit has no right to step into the shoes of a beneficiary).

■ We believe that *Kaiser, Carley Capital, Economic Enterprises* and *Texas Steel* are each a deviation from the sound trend of decisions holding that issuers, confirming banks and nondebtor account parties of standby credits issued to support secured debt are entitled to be subrogated to the rights of secured beneficiaries. *See Chemical Bank v. Craig (In re Glade Springs, Inc.),* 826 F.2d 440 (6th Cir.1987); *In re National Service Lines, Inc.,* 80 B.R. 144, 145 (Bankr.E.D.Mo.1987) ("A bank which pays a debtor's obligation pursuant to a letter of credit functions in substance like a guarantor or surety of the debtor's obligation.... Because [the beneficiary] would have been entitled to an administrative expense priority claim had it not been paid by [the issuer], it follows that [the issuer] is entitled to an administrative priority claim in this case."); *In re Sensor Systems, Inc.,* 79 B.R. 623, 626 (Bankr.E.D. Pa.1987) ("[A] party issuing a standby credit in favor of another is logically characterized as a 'guarantor' or a 'co-debtor'."); *In re Minnesota Kicks, Inc.,* 48 B.R. 93, 104 (Bankr.D.Minn.1985) ("[P]recluding the assertion of subrogation rights to issuers of standby letters of credit while allowing guarantors to assert them would be no more than an exercise in honoring form over substance."). Although we agree with the outcome in *Sensor Systems* and *National Service Lines,* we do not believe it is necessary or even helpful to characterize an issuer as a surety or guarantor. An issuer is clearly not a surety or guarantor and the right of an issuer of a

standby credit to subrogation is not dependent upon such a characterization.

The United States Court of Appeals for the Sixth Circuit, in its *Glade Springs* holding, provided strong authority for the proposition that an entity should not be denied the remedy of subrogation merely because such entity is primarily liable under a standby letter of credit. In *Glade Springs,* a debtor's obligation to repay its note was supported by a standby letter of credit issued for the account of the debtor and for the benefit of the note holder. The debtor's obligation to reimburse the issuing bank was secured by a deed of trust covering certain real property owned by the debtor. The standby credit was confirmed by a confirming bank that ultimately honored the credit when the issuer failed and was taken over by the FDIC, which refused to honor the standby credit. The confirming bank sought to be subrogated to the rights of the issuing bank with respect to the deed of trust. The bankruptcy court concluded that the confirming bank was entitled to subrogation and observed that to deny the confirming bank the right to subrogation would result in a windfall to the debtor. *Glade Springs,* 826 F.2d at 441. On appeal, the district court reversed the decision of the bankruptcy court and, relying on the rationale of *Economic Enterprises,* determined that because the confirming bank's liability for honoring the standby credit constituted an independent and primary obligation and not a guaranty or suretyship, the confirming bank was not entitled to subrogation. *Id.* The United States Court of Appeals for the Sixth Circuit, reversing the district court, held that under equitable principles of subrogation, the confirming bank was entitled to be subrogated to the rights of the issuer. *Id.* at 442.

In *Glade Springs,* the Sixth Circuit implicitly rejected the rationale of *Kaiser, Carley Capital, Economic Enterprises* and *Texas Steel* in holding that an entity that is primarily liable under a standby letter of credit (*i.e.,* a confirming bank) is entitled to the remedy of subrogation. Under the U.C.C., a confirming bank's obligation to honor a letter of credit is, in

accordance with the "independence principle," independent of the issuer's obligations. *See* U.C.C. § 5–107(2) (1987) [Va. Code Ann. § 8.5–107(2) (1965)] ("A confirming bank by confirming a credit becomes directly obligated on the credit to the extent of its confirmation as though it were its issuer and acquires the rights of an issuer."); U.C.C. § 5–107, Official Comment 2 (1987) [Va.Code Ann. § 8.5–107, Official Comment 2 (1965)] ("The most important aspect of this rule is that a beneficiary who has received a confirmed credit has the independent engagements of both the issuer and the confirming bank."). Notwithstanding the "primary obligation" of the confirming bank to honor the letter of credit, the *Glade Springs* court recognized that the confirming bank's payment of the letter of credit "extinguished the debtor's ... obligation to pay the debt to [the beneficiary]" and therefore held that the confirming bank was entitled to subrogation. *Glade Springs*, 826 F.2d at 442.

Having rejected the Debtor's argument that Rodgers, as a nondebtor account party under the Letter of Credit, is not entitled to subrogation, we turn next to the Debtor's contention that the Original Agreement created third party beneficiary rights in favor of the Guarantors. The Debtor argues that the Amendment subsequently entered into by Rodgers and the Debtor abrogated these third party beneficiary rights. Because the Guarantors did not consent to the Amendment, the Debtor contends that the Amendment is void leaving intact the waiver of subrogation language contained in Paragraph 3 of the Original Agreement.

■■■ A third party beneficiary is one who is intended by the parties to a contract to benefit from a promise contained in such contract. *See Professional Realty Corp. v. Bender*, 216 Va. 737, 739, 222 S.E.2d 810, 812 (1976) ("[T]he third party must show that the parties to the contract clearly and definitely intended it to confer a benefit upon him."). Furthermore, a third party beneficiary's rights vest when the party materially changes his position in justifiable reliance on the promise or brings suit or manifests assent to it in a manner invited by the promisor or promisee. *See* Restatement, Contracts 2d § 311(3), Comments f, g, and h. Here, a colorable argument could be made that the Guarantors are third party beneficiaries and their rights have vested. However, for the reasons stated herein, we do not so hold. For even if we were to assume that the Guarantors are third party beneficiaries whose rights have vested, the Debtor has not demonstrated that Rodgers has violated or intends to violate any promise made for the Guarantors' benefit.

■■■ The Guarantors were benefited by Rodgers' agreement to waive subrogation and its acknowledgment that it would have no recourse against the Guarantors only to the extent Rodgers precluded itself from seeking personal recoveries against the Guarantors under their guaranties delivered to the Bank of Baltimore. The Guarantors have acknowledged that the intent of the Original Agreement was for Rodgers to look to the real estate, and not to the Debtor or the Guarantors, to recoup any monies that it advanced. *See Transcript of Hearing on Rodgers' Proofs of Claim*, August 29, 1990, at 43 (Mr. Alvey testified that he told a representative of Rodgers that Rodgers "should look to the land and the [Debtor] to be made whole in this project, ...."). The waiver of subrogation promise in the Original Agreement was not intended to benefit the Guarantors as it relates to the real property. It appears that if the waiver of subrogation language was to benefit the Guarantors at all it was only designed to limit their personal liability to Rodgers to the extent that Rodgers might seek subrogation with respect to their personal guaranties in favor of the Bank of Baltimore, an action not taken by Rodgers. There can be no action for breach of contract unless the plaintiff sets forth a breach by the defendant of the contract. *See Christopher v. Cavallo*, 662 F.2d 1082, 1083 (4th Cir.1981). Rodgers is seeking subrogation only with respect to the deed of trust held by the Bank of Baltimore. *See* Rodgers' *Response to Debtor's Memorandum of Law in Support of Debtor's Objection to Proof of Claim* at 3. If Rodgers were to seek re-

covery against the Guarantors under their guaranties through subrogation, only then might the Guarantors legitimately assert their rights as third party beneficiaries. We express no opinion on whether such assertions would have merit. Hence, even assuming that the Original Agreement created third party beneficiary rights in the Guarantors, the only promise contained in the Original Agreement that could survive would be the promise made by Rodgers not to seek recoveries against the Guarantors.

For the foregoing reasons, we hold that Rodgers shall be subrogated to the rights of the Bank of Baltimore in the collateral securing the bank's claim, but not in the guaranties, and that such rights of subrogation shall be subordinate to the rights of the bank until the entire amount of the bank's claim has been paid in full, in accordance with 11 U.S.C. § 509(c) and general equitable principles.

Accordingly, for the reasons stated herein, the Debtor's objection to Rodgers' proof of claim is denied. An appropriate order will be entered.